**THOMES et al. v. ATKINS et al.**

Civ. No. 436.

District Court, D. Minnesota,
Fourth Division.

Aug. 9, 1943.

Benedict Deinard and Hyman Edelman (of Leonard, Street & Deinard), both of Minneapolis, Minn., for plaintiffs.

John J. McKasy and Maurice A. Hessian (of Thompson, Hessian & Fletcher), both of Minneapolis, Minn., for defendants.

NORDBYE, District Judge.

This action is brought to recover the value of plaintiffs' securities, consisting mainly of stocks registered in their names, on the theory that the defendants converted them to their own use because they were not good-faith purchasers for value. Defendants are a New York partnership operating as Slaughter & Russell and A. O. Slaughter & Company, and were licensed to carry on a brokerage business pursuant to the Minnesota Securities Act, Chapter 80, Minnesota Statutes for 1941. An office was maintained in Minneapolis during the period in question, when securities and commodities were bought and sold for, the accounts of their various customers. One of their customers was Stanley. W. Gongoll, doing business as S. W. Gongoll & Company, who purported to furnish an investment service to his customers. During the year 1935, Gongoll operated in several states of the Union, although his headquarters was in Minneapolis. Usually his customers were induced to turn over to him such securities as they might own with the understanding that the securities would be used as collateral in margin deals to be handled by Gongoll. The understanding between Gongoll and his customers was reflected in certain contracts or agreements which, throughout the years of his operations, were varied in form. The two contracts with which we are concerned in the instant situation are termed Investment Management contracts and Joint Fund agreements. One or more of the plaintiffs may have deposited certain securities under contracts designated by a different name, but they were substantially the same as the

two above enumerated. In the Investment Management contract, Gongoll was appointed to act as agent for the customer in the investment, in margin deals, of funds realized from borrowing up to 50% of the value of the securities deposited with him. Gongoll was to be paid as compensation for his services a commission "computed at the rate of ten per cent (10%) per quarter on the market value of all assets managed for Principal since the close of the preceding quarter, except such portion thereof as arises from income or capital gains accruing during said period; provided, however, that Agent's commission shall in no case exceed fifty per cent (50%) of the amount by which the value of the assets managed for Principal shall have increased since the close of the preceding quarter, excluding from such computation, any income or capital gain on any securities delivered to Agent by Principal or purchased under Principal's specific directions."

In the Joint Fund agreement, Gongoll agreed to furnish cash or collateral credit equal to 10% of the amount furnished by the customer. The parties purported to join funds on a partnership basis. Net profits were to be divided equally. In the Investment Management contract, it was expressly stipulated that the securities delivered by the customer were to be used for collateral purposes only and not to be sold unless the customers directed. In the Joint Fund agreement, the same understanding is to be found in the language used, though the restrictions on sale are not expressed as clearly. Gongoll, however, did not adhere to the terms of the contract. Certainly, in most instances, he did not bother to deposit his 10% interest in the Joint Fund agreement. Moreover, as soon as the plaintiffs deposited their securities with him, he sold them through defendants' Minneapolis office, and the funds realized from the sale, less the usual commission paid to the defendants as brokers, was credited to Gongoll's so-called Securities Account. From the Securities Account, Gongoll transferred funds from time to time to the Commodities Account, which he kept with these same defendants. He speculated heavily in grain for his customers with this and other money, utilizing the facilities for such trades afforded by the defendants. That the plaintiffs knew that they were delivering their securities to Gongoll to enable him to trade for them in the grain market is evident. They did assume, however, that the securities delivered were to be used as collateral up to 50% of their market value, and at least as far as these plaintiffs are concerned, Gongoll was not directed to sell the securities. In order to conceal the sale of the securities from his customers, Gongoll would pay them from time to time the dividends which may have been declared on the stocks which had been sold, and payments also were made from time to time to the customers, which sums were supposed to, and at times did, represent the earnings derived from the transactions which Gongoll had carried on for their benefit in pursuance of the agreement entered into. Gongoll was not licensed to do business as a broker in the State of Minnesota, and the contracts referred to were not registered under the Minnesota Securities Act. Plaintiffs urge, therefore, that the contracts being securities within the meaning of the Act are void, absent registration, and that being void, Gongoll became a converter when he sold the stocks and bonds of his customers, and that, therefore, the defendants became converters and are responsible for the reasonable value because they did not receive the securities as good-faith purchasers for value, as required by the Uniform Stock Transfer Act, Sec. 302.08, Minn.Stat.1941. This statute reads: "Rescission. If the endorsement or delivery of a certificate was procured by fraud or duress; or was made under such mistake as to make the endorsement or delivery inequitable; or if the delivery of a certificate was made without authority from the owner, or after the owner's death or legal incapacity, the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless the certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful, or the injured person has elected to waive the injury, or has been guilty of laches in endeavoring to enforce his rights."

It is recognized that the burden rests upon the defendants to establish that they received the securities in question as good-faith purchasers for value. Defendants not only assert that the evidence clearly establishes compliance with the statute in question, but they also assert that the Court lacks jurisdiction over their persons in that they are non-residents and the only service obtained was under Section 3996-11, Mason's Minn. Statutes, 1940 Supplement, and that that section is inapplicable herein.

408

## I. Did the Court Obtain Jurisdiction Over the Defendants?

Section 3996-11, Mason's Minn. Statutes, 1940 Supplement, reads in part: "Every non-resident person shall, before having any securities registered or being licensed as a broker, dealer, or agent, appoint the 'Commissioner of Securities,' and his successor in office, his attorney upon whom process may be served in any action or proceeding against such person or in which such person may be a party, in relation to or involving any transaction covered by this Act, which appointment shall be irrevocable. Service upon such attorney shall be as valid and binding as if due and personal service had been made upon such person.".

■■■■ As defendants point out, the problem with respect to this case is to determine whether the instant suit is an action "in relation to or involving any transaction covered by this Act." Concededly, the Act governs the sale of securities to a purchaser, but it also governs the granting and revocation of brokers' licenses by the Commissioner of Securities. In Kaiser v. Butchart, 197 Minn. 28, 265 N.W. 826, 827, the Minnesota Supreme Court held that an action is related to or involves "transaction[s] covered by this act" if the transaction is one which might create grounds for the Commissioner to revoke the broker's license which was granted under the Act. And in Streissguth v. Chase Securities Corp., 198 Minn. 17, at page 22, 268 N.W. 638, at page 641, Justice Holt said: " * * * By complying with section 3996-11 defendant has consented to be so served in any action or proceeding relating to its transactions as a stock broker in this state, while holding a license as such from this state."

Consequently, defendants' contention that the Act applies only in cases in which the defendant is the seller of securities and plaintiffs the purchasers of those securities seems unsound. Plaintiffs charge in their complaint that defendants accepted securities from Gongoll and credited his account with the proceeds from their sale knowing that the plaintiffs had only intended that the stocks and bonds be used as collateral and not for sale; further, that the stocks and bonds were delivered to Gongoll in pursuance of certain contracts which were securities within the meaning of the State and Federal securities acts, and that such contracts were unregistered, all of which was known to these defendants. Such a situation, if true, would give rise to conduct on the part of these defendants which would be subject to the discipline of the State Securities Commission and might well be a basis for revocation of their license as brokers. Consequently, the instant case seems to be one which is sufficiently related to transactions under the Act to justify service pursuant to Section 3996-11, Mason's Minn. Statutes, 1940 Supplement. The State Commission under the Minnesota Act would have authority to exercise jurisdiction over defendants as a licensed broker in enjoining them from being a party to fraud in the disposition of securities.

In Dragon Motor Co. v. Storrow, 165 Minn. 95, 205 N.W. 694, upon which defendants rely, the transaction upon which the action was based was unrelated to any sale of securities by the defendant. See, also, Zochrison v. Redemption Gold Corp., 200 Minn. 383, 274 N.W. 536. True, in the Dragon Motor case, the court did declare that, "The purpose of the statute, as defined in the title, is to prevent fraud in the sale and disposition of stocks, bonds, and other securities sold or offered for sale within the State of Minnesota." 165 Minn. at page 96, 205 N.W. at page 694. And that "a fair construction of the act and the powers executed pursuant thereto is one which limits the right to acquire jurisdiction of the person of a nonresident dealer in securities by service of process on the public examiner to cases involving the sale or attempted sale of securities." 165 Minn. at pages 99, 100, 205 N.W. at page 695. But, as noted above, the instant case does involve and relate to the sale of securities. It arises out of the sale of plaintiffs' securities, and certainly the maintenance of this case does not run counter to the Act's purpose, for it is just as possible for fraud to exist with respect to the buyer as it is with respect to the seller. In view of the Butchart case, it is to be doubted that the Dragon Motor case can be construed as narrowly as the defendants urge; that is, that plaintiffs have purchased no stock or other securities from defendants and therefore cannot maintain an action instituted by service under Section 3996-11.

■■■■ The other cases which defendants cite—Edson v. O'Connell, 190 Minn. 444, 252 N.W. 217; Farmers' & Merchants' State Bank v. Graif, 150 Minn. 315, 185 N.W. 374; and First Nat. Bank v. Klimen-

hagen, 159 Minn. 469, 199 N.W. 91—do not seem relevant to the question of jurisdiction. None of these cases discuss the jurisdictional question, and certainly this Court's jurisdiction does not depend upon whether defendants have violated the Act. The Court exercises its jurisdiction (power) to determine whether defendants have violated the Act. It would follow, therefore, that this Court possesses jurisdiction over defendants' person by virtue of the service under Section 3996-11, for it is an action which can be brought and determined by service under that section. The Act must be construed broadly. State v. Hofacre, 206 Minn. 167, 169, 288 N.W. 13.

## II. Were Defendants Good-Faith Purchasers for Value?

Plaintiffs argue that defendants were not purchasers for value because Gongoll's grain speculations to which defendants were parties constituted gambling, and therefore the sales were void. They do not dispute that defendants paid Gongoll a reasonable price for the securities by crediting his Securities Account. Likewise, they do not dispute that the funds were transferred to Gongoll's Grain and Commodities Account from his Securities Account, or that Gongoll made numerous withdrawals on balances in his Securities Account for purposes other than trading in commodities. Furthermore, it appears that funds from other sources went into the trading account.

Section 10223-1, Mason's Minn.Stat.1927, declares: "Every contract of sale for future delivery of wheat, grain or other farm products wherein the actual delivery of the commodity sold is not, in good faith, contemplated or intended by the contracting parties, is hereby declared to be a gambling contract; is hereby made illegal and the parties thereto made liable to the penalties hereinafter provided."

■ There seems to be no doubt that Gongoll purchased grain through the defendants and that neither Gongoll nor the defendants expected that he would take delivery of the grain. Both seemed to have anticipated that Gongoll would sell it and settle with the defendants for the difference between the purchase and selling prices in the various transactions. Indeed, all of Gongoll's grain transactions were of that pattern. Gongoll earned his living by such manipulations. He was not a dealer in grain or any other commodities, and he was not in a position to take delivery.

There is no claim that he expected to take delivery or that defendants thought he would. Speculation was Gongoll's business and defendants knew this. Consequently, in view of the circumstances, it seems clear that these transactions were gambling. Bolfing v. Schoener, 144 Minn. 425, 175 N.W. 901; Deterling v. Geib, 192 Minn. 60, 255 N.W. 484; Burke Grain Co. v. St. Paul-Mercury Indemnity Co., 8 Cir., 94 F.2d 458.

■ Were defendants purchasers for value? The question as to whether the defendants were purchasers for value arises on account of the gambling transactions which took place when Gongoll carried on his margin transactions for these plaintiffs with the defendants. However, in determining the relevance of these gambling transactions, it must be remembered that plaintiffs are not seeking to recover the value of their securities because the securities themselves were used in gambling transactions. This action is bottomed on conversion, and the gambling feature only goes to the question as to whether defendants are purchasers for value. At the outset, it must be recognized that the securities of these plaintiffs were not taken by the defendants as part of the gambling res. In Gongoll's dealings with the defendants two steps were involved; first, the sale of plaintiffs' securities—the parties apparently agree that the defendants are in the position of a purchaser of the securities—which transaction, therefore, according to the plaintiffs, constitutes a conversion; second, the grain and commodities speculation by Gongoll through the brokerage facilities furnished by the defendants. Consequently, it is difficult to understand how the element of gambling could have tainted the sale of the securities when defendants paid the reasonable market price therefor and had no knowledge that Gongoll was selling them contrary to his agreement or understanding with the customer. It appears that Gongoll used the funds in the Securities Account not only for replenishment of the Grain and Commodities Account, but he used it for other purposes; that is, it appears that the Securities Account funds were not only used for grain and commodities speculation. The moneys in the Securities Account were used for divers purposes, including actual and supposed returns to Gongoll's customers from their dealings with him. He apparently kept up the appearance that the securities were merely hypothecated in that,

from time to time, he would pay to the customer the dividends that may have been declared on the particular security. There was no understanding between Gongoll and these defendants that any of the proceeds of the Securities Account should be, or must be, used for trading purposes. Furthermore, it appears that plaintiffs have not traced the proceeds derived from the sale of their securities into the so-called trading account. Certainly, no inferences are necessarily drawn that plaintiffs' money, rather than someone else's funds, went into the margin transactions. True, plaintiffs do point out that when defendants bought Mr. Thomes' International Harvester stock on June 7, 1937, for approximately $8,000, Gongoll transferred $6,500 from the Securities Account to the Grain and Commodities Account. But it must be recognized that, on that day, Gongoll had some $20,962.64 in his Securities Account. It cannot be assumed that Gongoll transferred Thomes' money rather than the money which had been in the account previously. Plaintiffs' position becomes untenable in that they have failed to establish that, when defendants paid the reasonable value for the securities which Gongoll sold, there was any understanding or agreement as a part of that transaction that the proceeds were to be used, or were in fact used for gambling purposes. This action is not predicated on the recovery of such sums as could be traced into the Grain and Commodities Account. Plaintiffs have chosen in this action to charge the defendants as converters of their securities because Gongoll was a converter by reason of his failure to comply with the Minnesota Blue Sky Law. The payment of full value for the securities is not, therefore, avoided by any gambling transaction which may have occurred with a fund into which the proceeds were transferred. It does not seem sound to urge that the gambling nature of the transactions in which the proceeds may have been involved can be imputed to the transactions in which the proceeds were obtained. The indisputable fact remains that the defendants paid full value for plaintiffs' securities. While plaintiffs are in pari delicto with defendants in any gambling transactions, no attempt has been made to discuss the effect of that situation upon their rights.

Were defendants purchasers in good faith? As before stated, the facts herein fully warrant a finding that defendants possessed no actual knowledge of Gongoll's conduct or wrongful sale of plaintiffs' securities; that is, defendants had no actual knowledge that Gongoll committed any fraud or that he sold the securities in violation of any contract or understanding that he had with his customers. In addition, the showing does not justify a finding that defendants had any actual knowledge that Gongoll was violating the so-called Blue Sky laws in the sale of the contracts to his customers. Plaintiffs have based their claim primarily on the so-called doctrine of "red lights ahead," which doctrine is unquestionably recognized by the Minnesota courts. According to this doctrine, however, the third party "must investigate only under exceptional circumstances." Such exceptional circumstances arise when a party to a transaction has knowledge (not suspicion, surmise or fear) that some fact or facts exist with respect to a transaction which "would prevent action by those commercially honest men for whom law is made." Fortier v. McRae, 190 Minn. 571, 252 N.W. 833, 834; Gerseta Corp. v. Wessex-Campbell Silk Co., 2 Cir., 3 F.2d 236, 238. Moreover, it is well settled that, although such facts are not conclusive individually, they may be conclusive in the aggregate. Mere negligence in not knowing facts is not sufficient to invoke this doctrine, which charges the party with notice of the facts. The query, therefore, in the instant case may be stated as follows:

Were the facts of which defendants were aware sufficient to cast suspicion on Gongoll's title to the securities in question, and thus lead a prudent man to make inquiries which would have disclosed the true state of facts? Or, it may be stated this way: Did the defendants have knowledge of such facts and circumstances which would deter a commercially honest man from acquiring title to the securities in question without further investigation? King Cattle Co. v. Joseph, 158 Minn. 481, 198 N.W. 798, 199 N.W. 437.

To determine the answer to the questions above propounded is fraught with many difficulties. It is impossible for anyone to look into the minds of the various actors and determine just what was known. After the crash of any investment institution or concern, one is so much wiser than he was before. Everyone is so prone to contend that anyone dealing with Gongoll should have known of the dangerous ground upon

which he was treading. Such observations may be highly pertinent in analyzing the conduct of those who were apparently so gullible as to leave their securities with him for trading purposes. On the other hand, it must be remembered that Gongoll was only one of many customers of these defendants. The business transactions that defendants conducted with Gongoll did not markedly differ from the business of others. The selling of securities and handling margin trades for others by an investment counselor or manager was not exactly a novel or unusual situation. In all of his dealings with the defendants, Gongoll in no way indicated that he was not upright and honest. Despite the statute condemning gambling on grain markets, one cannot be blind to the fact that the practice is the avocation, at least, of many otherwise respectable citizens. It was apparent to those who were doing business with Gongoll that he had a large following, who apparently assumed that he was some sort of a miracle man who could guarantee profits if permitted to trade with the other man's money. Undoubtedly, many informed men had no confidence in his plan of operation. Others were evidently intrigued by his apparent ability as a chartist and his adeptness in forecasting market trends. It may be pointed out that he was prominent in local church activities, and up to the time of the crash these defendants had no knowledge that he was carrying on any fraudulent transactions with his customers, nor did they have any knowledge that the customers were not fully satisfied with that which Gongoll was assuming to do for them. Consequently, it must be borne in mind that the only fact or facts which came to the knowledge of the defendants which has any bearing upon their good faith in purchasing negotiable securities from Gongoll pertains to his non-compliance with the Securities Act, State and Federal, 15 U.S.C.A. § 77a et seq. It is a well-known fact that until July, 1935, there was a marked difference in opinion among lawyers in this State, and even among Attorney Generals of the State, as to whether the so-called Joint Fund agreement and Investment Management contracts were securities within the meaning of the State or National Blue Sky acts. The Wickham decision, Securities and Exchange Commission v. Wickham, 12 F.Supp. 245, handed down by this Court in September, 1935, was one of the first decisions to pass upon this question. Undoubtedly, that decision

unequivocally held that contracts of the type issued by Gongoll were securities within the meaning of the Federal law, and that registration was required. However, the Minnesota state courts had not passed on that question, and it·is highly significant that, notwithstanding the Wickham decision, no legal steps were taken by the State Securities Commission to curb the activities of Gongoll, although the Commissioner of Securities wrote a letter under date of October 4, 1935, notifying him that a contract used by him entitled "Capital and Income Management Agreement" would be held to be a security and the sale thereof illegal without registration. It was not until after the Gongoll crash in 1938, and in a criminal proceeding against one of his officers, who was charged with selling unregistered securities, that the Supreme Court of Minnesota in · State v. Hofacre determined that question. This decision was handed down on October 27, 1939. Admittedly, if defendants knew of facts and circumstances which would have deterred an honest and prudent person from dealing with Gongoll without further investigation, they were not purchasers in good faith. But what are the facts which came to the defendants and which would have led a prudent man to make inquiry which would have disclosed the illegal status of these contracts? Communications between the Chicago and Minneapolis offices of these defendants in 1935 would indicate that copies of at least one or more of the forms of the contracts used by Gongoll were made available to the defendants. In addition, it would appear that the defendants had seen one of the contracts used by Gongoll in April, 1937. This fact seems evident from Gongoll's letter to one Hovorka, written in April of 1937, in which he stated, in part:

"I had a nice visit with Mr. Dunhill last nite at Bob Rice's home.

"Bob and I took him over the new contract and he understands it very well and agrees to give us the best kind of sendoff on any inquiries."

It appears that Mr. Rice was the manager of the Minneapolis office of these defendants and Mr. Dunhill was one of the partners. It is contended by the defendants that the letter was hearsay and hence inadmissible. True, in a sense it may be classed as hearsay, but that fact does not necessarily characterize it as inadmissible. Courts have frequently permitted

412

such "past recorded recollection" to be received in evidence as one of the many exceptions to the hearsay rule. See Acklen's Executor v. Hickman, 63 Ala. 494, 498, 35 Am.Rep. 54; Dunlap v. Hopkins, 7 Cir., 95 F. 231; Manning v. School Dist., 124 Wis. 84, at page 97 et seq., 102 N.W. 356; Chicago & Alton R. Co. v. American Strawboard Co., 190 Ill. 268, 60 N.E. 518. See, also, III Wigmore on Evidence, Sec. 734 and 744, et seq.; 3 Jones on Evidence, 4th Ed., Sec. 875. There seems little doubt that this rule is sound. Moreover, when the letter was offered and received in evidence, the writer, Gongoll, was on the witness stand. The evidence amply supports plaintiffs' contention that the letter was tantamount to a contemporaneous memorandum made by Gongoll. While Gongoll professed no present recollection of the transaction referred to in the letter, he did state that, in his opinion, the memorandum thus made by him was true and correct.

There is nothing to indicate in the record that the consideration of the Gongoll contracts in 1935–1937 was prompted by any question of their validity under the State or National security acts. It would appear that Gongoll was endeavoring to obtain the good-will of Dunhill if any inquiries came to him regarding Gongoll's activities and that the defendants had inquiries from persons who desired to see the contract forms used by Gongoll. But there is every reason to believe that the defendants were aware of and possibly concerned about the Wickham decision and its effect on Gongoll's trading. This is evident from defendants' Exhibit 62. This letter is dated September 24, 1935, and is written by Gongoll to the Slaughter Company. It reads, in part: "Enclosed you will find the only contract we are selling at the present time. Our representative is in Washington, D. C., investigating this matter with the Securities and Exchange Commission. As soon as we have any definite information, we will advise you."

The Wickham decision was given considerable publicity in the Chicago Journal of Commerce, as well as the local papers. These newspapers came to the Minneapolis office of the defendants, and it is very probable that the references to this decision were read by the manager and possibly by one or more of the defendants. In any event, the letter, Exhibit 62, would indicate that it was probably written by reason of the concern that these defendants had expressed or indicated with reference to the status of Gongoll's business and the effect of the Wickham decision on his activities. We were not furnished any information as to any further correspondence or meetings between Gongoll and these defendants in this regard. But it is significant to note that, after the Wickham decision, Gongoll was changing his method of doing business, in that he organized many subsidiary companies in the states in which he was doing business, so as to carry on an intrastate business rather than an interstate one, which he had carried on prior thereto. It is quite probable that the defendants were aware of Gongoll's attempt to avoid conflict with the Securities & Exchange Commission during this period, but the mere fact that Gongoll may have ceased, or attempted to cease, interstate business does not infer that he was necessarily dishonest or that he was conducting fraudulent transactions. Nor can one necessarily deduce from such circumstances that Gongoll was violating the laws of the State of Minnesota in the sale of his contracts. In other words, merely because these defendants may have known that Gongoll was apprehensive of conflict with the Securities & Exchange Commission does not necessarily mean that they knew or should have known that his contracts would run afoul of the Minnesota Blue Sky Act. As before stated, the Wickham decision was filed in September, 1935, and Gongoll kept on doing business without any apparent interference from the Minnesota authorities for nearly three years thereafter. The record does not indicate what took place between Gongoll and the State Securities Commission. Whether by changing the forms of his contracts, or by other representations made to the State Commission, he convinced that department that his contracts did not require registration as a security, and thus was permitted to continue, is a matter of speculation and conjecture. In any event, the striking fact is that he openly and notoriously carried on the business of selling these contracts in the State of Minnesota after the Wickham decision without any interference from the State authorities. Consequently, as we endeavor to summate the facts that came to the knowledge of these defendants, the most striking and important fact is the knowledge that must have come to them regarding the State's tolerance of Gongoll's transactions. The query then may be pointedly put: Should these defendants, under such circumstances, have assumed from the knowledge that came to them that,

as prudent men, they should make inquiry as to whether Gongoll was violating the law of the State of Minnesota? Was it not more logical for them to assume that in some way Gongoll had made peace with the State authorities and that his contracts were either registered or did not require registration under the Minnesota Act? At least, was it not logical and natural for them to believe that everything was regular? Certainly, we must recognize that whether the Gongoll contracts were subject to registration under the Minnesota Blue Sky law was not an open and shut question. The Wickham decision was, after all, but the view of one trial court interpreting a Federal statute. That the question was a troublesome one would appear from the circumstances surrounding the Hofacre case. A demurrer had been interposed to the indictment and while the court had overruled the demurrer, he considered the question sufficiently important or doubtful so as to justify the certification of the legal questions to the Supreme Court. The important legal question which he certified was whether the Joint Fund Agreement—the same agreement which has heretofore been referred to—came within the Minnesota Blue Sky statutory definition of a security. It would seem, therefore, that to charge these defendants with bad faith because they did not conclude and determine that, in light of the circumstances known to them, they should investigate as to whether Gongoll was violating the Blue Sky law in the respect referred to, and their apparent failure to comprehend the legal significance of the questions involved, is to impose upon them a burden which the law does not countenance nor require under the circumstances.

It may be pointed out that there was nothing in the Wickham decision to indicate that Wickham became a converter because he obtained moneys or securities under unregistered contracts. Members of the legal profession would understand that the decision in the injunction case would be decisive of that question, but laymen might well assume that the only effect on Wickham was that he could not carry on his interstate business without the approval of the Securities & Exchange Commission.

It seems reasonably clear, therefore, that the "red lights ahead" doctrine is not available herein. These securities were regularly endorsed and there was nothing thereon to indicate that the owners had not authorized Gongoll to sell them. No complaints ever came to these defendants, nor were there any demands upon the defendants from any of Gongoll's customers. The number of years that Gongoll operated without interference from State or Federal authorities would surely lull any person into the belief that his dealings were regular in so far as any Blue Sky laws were concerned. Indeed, the magnitude of Gongoll's dealings throughout the State would indicate that the State authorities were fully aware of all the circumstances which had come to the attention of the defendants. Again, it may be stated that if the ones charged with the duty of enforcing the law permitted the complained-of condition to exist for nearly three years after the Wickham decision, it is not surprising that these defendants were not alarmed or put on their guard when Gongoll was carrying on his margin transactions with them.

A recital of the dates when plaintiffs' securities were sold, as compared to the date of the Wickham decision, is revealing. Thomes turned over his International Harvester stock to Gongoll on May 27, 1937, and it was sold by the defendants on June 7, 1937. The stocks and bonds belonging to Cornell were received by Gongoll on August 13, 1937, and were sold by the defendants on August 23, 1937. The stocks and bonds belonging to Pearsall were received by Gongoll between April 2, 1937, and January 14, 1938, and were sold by the defendants between August 5, 1937, and January 18, 1938. By the lapse of time, therefore, since the Wickham decision in 1935, and the inaction of State officials, the "red lights ahead" were pretty well dimmed in 1937 and 1938, and to charge a dealer who bought negotiable instruments under these circumstances with bad faith because no inquiry was made as to whether Gongoll's contracts were securities within the meaning of the Minnesota statutes, finds no support in the teachings of the Minnesota decisions. It is necessary to keep clearly in mind that, of the many machinations attributed to Gongoll in his dealings with his customers, the only wrongdoing which plaintiffs rely upon in invoking the doctrine referred to pertain to the failure of Gongoll to register his contracts as securities and to register himself as a broker. Defendants had no business relations with the contracts subsequently held to be securities within the meaning of the Blue Sky law of this State. The attack on the title of these defendants to the stocks and bonds sold by them arises

414

solely from a lack of title which the law pronounces by reason of the application of certain statutory law to transactions between Gongoll and his customers. During all of the years that Gongoll had dealt with these defendants, the principles of law which plaintiffs now seek to invoke as to these particular contracts had not been enunciated by the courts of Minnesota or enforced by the enforcing officers of the State. It is the Court's view, therefore, that, on the showing made in this matter, the burden which rested upon these defendants to establish that they were purchasers in good faith for value of these negotiable instruments has been amply sustained.

Reference has already been made to Gongoll's failure to register as a broker, as required by the State law. There is no showing that these defendants knew of this fact, or that they had any knowledge of any circumstance which would lead a prudent person to investigate his status in that regard. It is pointed out that, from time to time, the Securities Commission sent out to various brokers, including these defendants, a list of all the registered brokers in the State of Minnesota. Gongoll's name was apparently not on the list. There is no showing that these defendants had any occasion to examine this list, or that anyone at any time called to their attention that Gongoll's name was not included among the names of the registered brokers.

Findings of fact and conclusions of law in harmony herewith may be presented on five days' notice. An exception is allowed to the plaintiffs.