**AMERICAN SANITARY PRODUCTS CO., also doing business as American School Supply Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 8690.**

United States Court of Appeals Tenth Circuit.

Aug. 7, 1967.

Bennett S. Aisenberg, of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for petitioner.

Julius Rosenbaum, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Washington, D. C., with him on brief), for respondent.

Before MURRAH, Chief Judge, PICKETT and BREITENSTEIN, Circuit Judges.

MURRAH, Chief Judge.

This unfair labor practice proceedings again raises the question whether there is substantial record evidence to support the National Labor Relations Board's conclusions that American Sanitary Products violated § 8(a) (1), (3) and (5) of the Act, 29 U.S.C. § 158. The trial examiner found that the employer violated § 8(a) (1) by coercively interrogating its employees concerning their union activities, threatening them with economic reprisals, promising benefits and improved working conditions and encouraging withdrawal from the union; that it violated § 8(a) (3) and (1) by wrongfully discharging one employee and making plain its antipathy toward union activities by its threats, promises and unlawful interrogation; that it violated § 8(a) (5) and (1) by refusing to bargain with the majority representative of its employees in an appropriate unit and by unilaterally changing the employees' pay periods without consulting the union.

The Board adopted these findings but rejected the examiner's findings that the evidence was insufficient to show that the employer violated the Act by affording benefits to employees for efficiency suggestions or by granting employees paid holidays on their birthdays and held that these actions violated § 8(a) (5).[1] The conventional cease and desist order was entered and the employer was affirmatively ordered to bargain collectively upon request, reinstate and make whole the discharged employee and post appropriate notices. The employer seeks review of this order, and the Board seeks enforcement. We enforce.

American Sanitary Products, the employer-company, is a wholesale distributor of school and janitorial supplies in Colorado and other states. Fourteen warehouse workers and truck drivers at its Denver plant comprise the bargaining unit involved here.[2]

On or about March 9, 1965, employee Ernest Tafoya contacted the union[3] organizer and arranged a meeting for the unit. Two days later, eight of the fourteen employees met with the organizer and signed cards authorizing the union to represent them. The following day two more employees signed cards. On March 12 the union sent the employer a demand for recognition and request to bargain, attaching photostatic copies of the ten signed cards. When, on the same afternoon, union representatives called at the employer's offices, they were unable to see any of its officials, but left a copy of the March 12 demand and request. On March 15 the employer refused in writing to recognize or bargain with the union, and on March 26 these unfair labor practice charges were filed.

The employer admits interviewing four of its employees regarding union activities, but attacks the sufficiency of the evidence to support any violation of the Act. It relies upon the testimony of its company officials to the effect that the interviews were merely conversations wherein the employees "felt free to honestly and without restraint express their dissatisfaction with the company's treatment of them". It further contends that even if the testimony of General Counsel's witnesses is accepted, there is nothing to show threats or promises, but only "bland statements" of what might or might not be done, none of which were conditioned on anything the employees might or might not do; that the only purpose of the interviews was to determine the validity of the union's majority and the employees were told they had a right to join a union and to organize and could not be kept from it.

The trial examiner credited the testimony of the four employees and found that on separate occasions the company president, Kamm, summoned each of the men to his office during working hours

---

1. The Board declined to decide whether these activities also violated § 8(a) (1) since there were other § 8(a) (1) violations and the remedy would not be affected.

2. The appropriateness of the bargaining unit is not in question.

3. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union 905.

and questioned them in the presence of other company officials regarding the union; that during the course of these interviews Kamm made statements to the effect that the employees "couldn't win with Local 905, and that he wouldn't argue with them if it had been any other local"; that Local 905 was not the "right union" (implying that the company could not do business with it); that he (Kamm) would fight the union and take it to court and furthermore would file unfair labor charges against it; and that the union was "illegal". The examiner further found that Kamm remarked that the company was not obligated to keep people on during dull seasons if the Union "appeared in the shop"; that the company could get by with two men instead of three in the winter time and implied if any were let go they were not required to be rehired. It was also found that the employees' past earnings were reviewed and they were told that if the union "came into the shop" there would be no more bonuses and overtime would be eliminated; that Kamm stated a public relations man was going to be hired to see that relations improved and "things will change around here"; that one employee was asked how he would like to be a truck driver (who presumably made more money) instead of a stock clerk; that each employee was asked to state his complaints about the company, which each did, even though at least one employee was "sort of scared".

There was also credited testimony to the effect that sometime after the refusal to bargain, the employees " * * * were getting tired of waiting for the Union, and so forth * * * " and made a proposal to Kamm for salary increases; that Kamm told them as long as they were in the Union he could not talk to them, and they would "have to come up to the Labor Board and withdraw from the Union first."

The examiner was careful to set forth in his findings the reasons for discrediting the testimony by employer's officials[4] and from the employees' testimony concluded that the interrogations, statements and promises constituted violations of § 8(a) (1). The record is amply supportive, and we find no reason to disturb his credibility judgment. Since it is within the peculiar province of the Board to draw permissible inferences from the credible testimony, our inquiry ends there. See Betts Baking Co., Inc. v. National Labor Relations Board, 10 Cir., March 1967 Term, 380 F.2d 199; Duo-Bed Corp. v. N.L.R.B., 10 Cir., 337 F.2d 850; N.L.R.B. v. Bear Brand Roofing, Inc., 10 Cir., 312 F.2d 616.

The next issue for consideration on appeal is whether, as the Board found, employee Tafoya was discriminatorily discharged for his active participation in union organization or whether, as the employer contends, he was discharged for cause. We recently decided this same question in Betts Baking Co., Inc. v. N. L. R. B., supra. There we faced the perplexing problems raised by such an issue and accepted the general necessity of proving discrimination by circumstantial evidence analyzed in the light of the peculiar facts of each case. Id. and cases cited.

It is conceded that Tafoya played a leading role in the union organization of the employer's plant, having instigated the movement for a union. He had been employed by the company more than four years and was second in seniority among the four regular truck drivers. His work record was good, and on several occasions he had been complimented by the Warehouse Foreman, the last time being in February before the Union advent in March. About a week after the Union demand for recognition, Tafoya was

---

4. The examiner stated that he had considered the testimony of the employer's witnesses and that " * * * in their testimony with respect to these conversations, [they] were not candid and no one of them gave a straightforward account of what was said. I do not credit their testimony in these instances where it may disagree with that of Johnson, Medrano, Gibson and Schmidt. The latter four were honest witnesses."

transferred from his job as a driver to work in the warehouse basement. The following week he was told the company was starting a "package delivery" service and was discharged in spite of the company's policy to give preference in employment to employees with seniority.

Again, Betts Baking Co., Inc. v. N. L. R. B., supra, is apposite. We stated there that "The discharge of qualified workers who are also active unionists ' * * * is a circumstance of suspicion which may give rise to a justified inference of violative discrimination'; in such case 'the issue must * * * be determined by the degree of significance to be given to [the employer's] explanation of the reason for the discharge.' " Id. 204, citing and quoting Rocky Mountain Natural Gas Co. v. N. L. R. B., 10 Cir., 326 F.2d 949, 952.

The employer admits that it was common knowledge among the employees that Tafoya was a key figure in the union organization, but contends there is no evidence that the company had any knowledge of that fact at the time of his discharge. Relying upon the testimony of its officials, it asserts that Tafoya was discharged for economic reasons in that the company had a total of six truck drivers which was too many; that Tafoya, who was attending auto body school, had told the Foreman on numerous occasions that when he graduated he would no longer be working for the company; and that in February he told the Foreman he "wouldn't be around much longer and that he would be graduating from auto body school and would be making more money"; that under these circumstances the company concluded that Tafoya was the proper employee to be discharged due to his nonpermanency. There was contrary evidence, however, that Tafoya still had approximately two years of school to complete and had never indicated an intent to leave his job with the company. And, the employer admits that when Tafoya was transferred to the basement, his truck and route were taken over by another employee, Lopez; that Lopez had only been with the company

six months and the Foreman had "heard rumors to the effect that Lopez might leave" but did not question him regarding it.

The trial examiner discredited the employer's evidence and contentions finding " * * * that in the circumstances of this case, including the 'small plant', concentrated union activity through Tafoya's leadership, [the Foreman's] general awareness of employees' activities, [employer's] intense interrogations of various employees indicating that it was maintaining an open and anxious ear to all Union activities, and the specious nature of the alleged reasons for Tafoya's discharge, [employer] had knowledge of Tafoya's Union leadership activities, and discharged him because of them"; that " * * * with knowledge of Tafoya's leading role in the Union activities to which it was militantly opposed, [employer] discharged Tafoya because he was the leader."

This inference of discrimination is certainly reasonable in the light of all the circumstances and has substantial support in the record.

The employer next asserts a good faith doubt of the validity of the union's majority as justification for refusal to bargain. It is not disputed that the authorization cards on their faces unequivocally conferred upon the union authority to represent the employees or that the employer had a photostatic copy of each signed card. But, the employer urges that it had sufficient grounds for believing that the union had misrepresented to the employees that there would have to be an election, i. e. see Englewood Lumber Co., 47 LRRM 1304, 130 NLRB 48; Furr's, Inc. v. N. L. R. B., No. 8686, Jan. 1967 Term, 10 Cir., 381 F.2d 562. In support it relies heavily upon the testimony of company officials to the effect that during the interviews with two of the employees, each stated the union had told him that by signing the card he was not obligating himself until there was an election at which time he could vote as he pleased. It further asserts that even if this testimony is dis-

believed, the two employees themselves testified to the effect that one of them told Kamm " * * * this card doesn't mean a thing if it comes to an election, I can still vote either way", and the other could not remember what he told Kamm in this regard; that this was sufficient to support a good faith doubt. The employer also points to its letter refusing to bargain wherein it set forth its doubt by stating, "We further feel that you have misrepresented your case to the people employed by our firm."

The examiner declined to credit testimony that the employees had repudiated their cards and found that " * * * at most, [they] told Kamm they could vote freely in an election should one take place." He further found "no merit to [employer's] claim that it had a good faith doubt as to the majority status of the Union" and that it had violated § 8 (a) (5) and (1). And see N. L. R. B. v. Albuquerque Phoenix Express, 368 F.2d 451, 454. Examination of the record discloses nothing to render the examiner's findings without substantial support. Moreover, we have affirmed the Board's findings that the company's interrogation and coercive conduct was in violation of § 8(a) (1), and it is well settled that " * * * § 8(a) (1) conduct is cogent evidence of lack of good faith". See Furr's, Inc. v. N. L. R. B., No. 8686, Jan. 1967 Term, 10 Cir., 381 F.2d 562, and cases cited there. The employer here seeks to establish that at the same time and as part and parcel of its interrogations, threats and coercion, it acquired in good faith a basis for doubting the union's majority. This theory cannot prevail.

Finally, the employer attacks the Board's findings that it violated § 8(a) (5) and (1) by changing the employees' pay periods and that it further violated § 8(a) (5) by adopting a program whereby employees would be paid for efficiency suggestions and by granting each employee a paid holiday on his birthday. As to the change in the pay periods, employer relies on evidence to the effect that the employees were being paid every

two weeks but were accustomed to drawing advances on their pay, and that the company freely granted this privilege in spite of a company rule prohibiting it. There was testimony that the company bookkeeper, who had been employed some three or four months prior to the change, suggested about two weeks before the change was made that the problem of keeping track of I.O.U.'s and making necessary deductions from the bi-monthly checks would be relieved by paying on a seven-day interval. The day after the bargaining demand was refused, Kamm met with the employees in the unit and offered them the option to change their pay days. All but two requested the change, and thereafter the advances against pay were considerably lessened. Regarding the suggestion award program and the birthday holidays, the employer relies upon evidence that they had been under consideration for some time and had been discussed and agreed upon at a Board of Directors meeting in December prior to the union advent in March, but were left pending until after receipt of a favorable financial statement in the Spring; that the financial report was received around the same time the union made its demand, and the programs were instituted immediately thereafter on March 18 and 24. It is vigorously argued that the union organization was purely coincidental with the institution of the previously agreed upon programs, and point is made that the latter two programs were not applicable to the employees in the bargaining unit alone, but applied to all of the company's employees equally.

This court's decision in Crown Tar and Chemical Works, Inc., v. N. L. R. B., 10 Cir., 365 F.2d 588, is directly controlling on this issue. In that case Crown officials directed a wage increase to become effective two months later. The workers, however, were not told of the increase, and the union organized prior to the effective date. In upholding the Board's ruling we held that Crown had violated the Act by waiting " * * * until the organizational effort was under way and

then, while in a position to refrain from granting the increase, and with knowledge of the union's activity and perhaps with knowledge of the union's claim to represent a majority, the increase was made effective." Id. 590; and see also Betts Baking Co., Inc. v. N. L. R. B., supra.

In this case the Board, while yet unaware of this court's decision, was mindful of its own ruling in Crown Tar and Chemical Works, Inc., 154 N.L.R.B. No. 41, and comprehensively applied it to the facts. Here the employees were never made aware of any of the proposed programs until after the union had fully apprised the employer of its claim of majority. In these circumstances the unilateral action by the employer was a violation of § 8(a) (5) (1).

The order shall be enforced.