**J. C. PENNEY CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 8874.

United States Court of Appeals
Tenth Circuit.

Aug. 29, 1967.

---

William C. McClearn, Denver, Colo. (Robert L. Morris, Morris B. Hecox, Denver, Colo., Eugene F. Rowan and Martin Zeiger, New York City, with him on brief), for petitioner.

Peter M. Giesey, Washington, D. C. (Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost and Nancy M. Sherman, Washington, D. C., with him on brief), for respondent.

Before MURRAH, Chief Judge, and PICKETT and BREITENSTEIN, Circuit Judges.

MURRAH, Chief Judge.

This matter arises from two separate unfair labor practice charges consolidated for hearing after the Union lost a 9(c) representation election. The Board adopted the trial examiner's findings that the employer had coercively interrogated its employees, threatened economic reprisals and promised benefits for union rejection; that it coercively interrogated employee Miller regarding wage increases; and that it unilaterally granted wage increases to its employees, all in

violation of § 8(a) (1), 29 U.S.C. § 158. It was also found that while the employer had not refused to bargain in violation of § 8(a) (5), the admitted wage increases were granted for the purpose of interfering with the employees' representation election. The election was set aside; the employer was ordered to cease and desist from its unlawful 8(a) (1) conduct and was further ordered to bargain with the Union upon demand. The crucial questions presented here are (1) whether substantial record evidence supports the Board's 8(a) (1) findings, and (2) whether the Union represented a majority of the employees prior to the representation election. If the latter be true, then we must decide a third question of whether the Board's finding that the wage increase violated 8(a) (1) will alone sustain a bargaining order in the absence of a finding that the employer unlawfully refused to bargain in violation of 8(a) (5).

The background facts and dates are essential to an understanding of our sequential questions. In November, 1964, the employer, J. C. Penney Co., Inc., placed a new operations and control manager in charge of its Denver warehouse (the only establishment involved here), and personnel changes were immediately instituted, including laying off some of the older employees and hiring new ones. The Warehouse Manager, Cox[1], and the remaining employees became "upset" over these changes and in mid-December Cox and four employees began a union[2] organization campaign. Cox actively encouraged employees to join the movement, and the Union was successful in obtaining signed authorization cards from all twenty-two persons then employed in the warehouse. Several days later, the Union sent a letter to the employer requesting recognition as bargaining agent of the warehouse employees, suggesting a meeting, and enclosing copies of the signed authorization cards. This letter was received by Cox's superior, Lenehan, Manager of the employer's downtown store, who after notifying company officials, contacted the Union agreeing to communicate later regarding the requested negotiations. About a week later, on December 29, the employer filed a representation petition alleging that the appropriate bargaining unit included the downtown retail store as well as the warehouse. The same day Lenehan sent a telegram to the Union stating that the employer doubted the Union's majority of employees in an appropriate unit and that it refused to recognize the Union until after Board certification. The Union replied on January 6 that it regarded the refusal to bargain as "nonmeritorious"; that its demand for bargaining was a continuing one and it stood ready, willing and able to meet; and that it was filing charges against the employer with the Board. [Charges were filed alleging refusal to bargain in violation of § 8(a) (5)]. Thereafter the employer pursued its first course of conduct found by the Board to be in violation of 8(a) (1).

The trial examiner found that during the first week in January one of the employees told Lenehan that Cox had influenced the signing of the Union authorization cards; that with this knowledge and on January 11 Lenehan "permitted" Cox, who now had apparently undergone a "change in heart" about the Union, to speak in the employer's behalf to the employees one at a time in the warehouse lunchroom and instructed him to tell the employees that the employer was not "peeved" at them for signing the Union cards. It was also found that during these private interviews on January 11, Cox encouraged the employees to withdraw from the Union, threatened economic reprisals if they "formed the union" and promised wage increases if they withdrew.

On February 5 Cox himself told Lenehan the part he had taken in the Union movement. The Board was notified; the

---

1. It is undisputed that Cox is a supervisor within the meaning of the Act.

2. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 452.

Union withdrew its 8(a) (5) refusal to bargain charge, and the employer withdrew its representation petition. About a week later, however, the Union secured new authorization cards from thirteen of the twenty-four employees then employed in the warehouse, and on February 17 filed the first unfair labor practice charge involved here alleging that the employer violated 8(a) (1) when it interrogated the employees, promised benefits and threatened loss of benefits conditioned upon rejection of the Union. The same day the Union also filed a petition for an election which was heard on March 18.

Nine days later and prior to the Board's decision on the election petition, the employer granted wage increases to be paid on April 5 to all of the warehouse employees except two newly hired. On April 16 the Board rendered its decision that the warehouse employees constituted an appropriate unit and ordered an election. The Union lost the election by one vote and filed its objections. It thereafter filed the second unfair labor practice charge involved here alleging that the employer interfered with the election in violation of 8(a) (1) by granting the wage increases and that it refused to bargain on and after December 21, 1964, in violation of 8(a) (5). The two unfair labor practice charges were consolidated for hearing pursuant to which the Board issued its disputed findings and order.

In considering our first crucial question, the employer first objects to the Board's finding that Cox's January 11 statements to various employees were in violation of 8(a) (1). It argues that the evidence is ambiguous and fails to establish that the statements were made; that even if the statements were made, the employees would have been skeptical of Cox's sincerity since only a few weeks prior he had been the primary participant in the organization movement; and that if the employees could have believed the alleged statements, they could be taken as nothing more than lawful opinions and views.

■ The trial examiner credited testimony by various employees to the effect that Cox told them in the January 11 interviews that he "thought they had all done wrong"; that he believed Lenehan was sincere and they ought to withdraw from the Union and give him a chance by going back to the company; that if they did so, they would possibly receive raises and that if they formed the Union they could lose benefits such as discounts and holidays; that employees at another Denver company had formed a union and had lost all of the benefits they had enjoyed; and that Lenehan had stated he was sorry "this had all come about" and Cox was convinced Lenehan would review the wage rates and make adjustments if the employees did not go ahead with the Union movement. The record amply supports these findings, and we will not disturb the examiner's credibility judgment. And see American Sanitary Products Co., etc. v. N. L. R. B., Filed Aug. 7, 1967, 10 Cir., 382 F.2d 53. This means, of course, that the Board's order in that respect must be enforced.

The employer next objects to the Board's finding that Cox's statement to employee Miller at the time the wage increase was granted was in violation of 8(a) (1). The Board found from an affidavit by Miller that when Cox informed him of his wage increase, Cox stated he was sure Miller "saw the light on the Union business and that a Union was not needed" and that this statement alone was a violation of 8(a) (1). The employer's objection to this finding is based upon three contentions: (1) that the statement was not alleged in the charge or amended complaint as an 8(a) (1) violation and could not, therefore, be the basis for a finding by the Board; (2) that the statement itself did not violate 8(a) (1); and (3) that the affidavit containing the statement was legally inadmissible for any purpose whatsoever.

■ It is conceded that the complaint did not specifically allege that the subject statement constituted a violation of the Act. But, "Courts as well as the National Labor Relations Board have held that a material issue which has been fairly tried by the parties should be decided by the

Board regardless of whether it has been specifically pleaded." American Boiler Manufacturer's Association v. N. L. R. B., 8 Cir., 366 F.2d 815, 821, and cases cited there. And, " * * * where evidence is received without objection, the pleadings are to be deemed amended". Id. 821 citing and quoting from Associated Home Builders of Greater East Bay, Inc. v. N.L.R.B., 9 Cir., 352 F.2d 745, 754; and see Rule 15, F.R.Civ.P. But, even so, we do not think this particular issue was ever injected into the lawsuit at the examiner's level.

Miller was called to testify in behalf of Regional Counsel. Considerable difficulty was encountered in obtaining satisfactory answers from him, and he had trouble recalling many things due to his "poor memory". Counsel showed him an affidavit he had signed "to see if it refreshes [your] memory". Miller read the document and testified that he recalled giving it and that the statements contained therein were true. Thereafter, counsel asked him, "After looking at the statement, Mr. Miller, do you recall what, if anything, Mr. Cox said at this occasion we are talking about—anything about Union business?" After Miller's reply, employer's counsel interjected, "Before we get into any further questioning in this regard, I move it is irrelevant to the pleading. The only allegations with regard to Mr. Cox are on or about January 11, and the only allegations as to April 5th is that an increase was granted, period. There is no indication of threats or promises * * * and I believe that's irrelevant to the allegations of the Complaint." The examiner stated, "I don't know what counsel is asking about at this stage, really", and Regional Counsel replied, "I believe this is the same thing that came up this morning. We have alleged in the Complaint violations of 8(a) (1) and (5) through the pay increases and I believe these are circumstances surrounding that pay increase." The affidavit was thereafter admitted into evidence, but nothing more was said concerning the violative nature of Cox's statement contained therein. On the basis of the affidavit alone the Board made the disputed finding.

From these facts we think it is clear the Board made a finding which was neither charged in the complaint nor litigated at the hearing. By Regional Counsel's own statement, it is manifest that the employer was never put on notice that Cox's purported statement standing alone was in issue, and that Miller's testimony and affidavit were introduced for the sole purpose of corroborating other evidence regarding the purpose of the wage increases. Moreover, the statement by employer's counsel reflects that if an attempt to enlarge the issues were to be made, he would object. Unquestionably, the examiner could have amended the complaint during the hearing to include the issue, i. e. see Associated Home Builders of Greater East Bay, Inc. v. N.L.R.B., supra, 753; Rule 15 F.R.C.P., but he failed to do so. His statement that he did not "know what counsel is asking about at this stage * * *" clearly indicates that he was unaware that a new issue was being projected into the hearing. Failure to clearly define the issues and advise an employer charged with a violation of the law of the specific complaint he must meet and provide a full hearing upon the issue presented is, of course, to deny procedural due process of law. N.L.R.B. v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144. We cannot enforce a finding based on a charge not in the complaint where the record, as does this one, clearly discloses that the issue has not been litigated. N.L.R.B. v. H. E. Fletcher Co., 1 Cir., 298 F.2d 594. Thus we do not reach the question whether the statement itself violated 8(a) (1).

We come then to the question whether the affidavit was admissible as corroborative evidence regarding the wage increases. The admissibility of the affidavit was, as we shall see, strongly contested in the hearing, and it is, of course, strong supporting evidence of the underlying purpose for the increases. The employer argues that the sole purpose for the affidavit was to impeach Miller's testimony and that the document itself

should, therefore, have been excluded. In the course of the hearing the affidavit was offered "* * * for the purpose of past recollection recorded * * *". Employer's counsel objected repeatedly on the grounds that he believed "* * * it would be impeachment of General Counsel's witness to introduce this affidavit into evidence for a purpose for which the witness, after having read it, still cannot recall." After a long colloquy with counsel, the examiner accepted the document into evidence "for the purpose offered". We think this ruling was proper.

▮▮ The use of a writing as a recorded past recollection has become a firm practice as one of the many exceptions to the hearsay rule. And see Wigmore on Evidence, 3rd ed. § 736; Thomes v. Atkins, D.C., 52 F.Supp. 405 and cases cited. But, care must be taken to distinguish a present recollection revived, where a writing is used to stimulate the witness' memory and the only evidence recognized is the testimony so refreshed, i. e. see United States v. Riccardi, 3 Cir., 174 F. 2d 883, and a prior inconsistent statement where the writing is considered solely for the purpose of determining the truthfulness of the witness, see Asaro v. Parisi, 1 Cir., 297 F.2d 859. In the instance of a past recollection recorded, the witness has no independent recollection of the events recorded in the writing, and the writing becomes a substitute for his memory, hence substantive proof of the facts it relates. The burden of determining whether the witness is devoid of recollection of the recorded events must necessarily fall upon the trial court or examiner, and with regard to reception of the writing into evidence, much necessarily depends upon his discretion. See United States v. Riccardi, supra, and cases cited. See also Asaro v. Parisi, supra; Shokuwan Shimabukuro v. Higeyoshi Nagayama, 140 F.2d 13, 16; United States v. Borelli, 2 Cir., 336 F.2d 376. To meet the accepted standards of admissibility, the trial court must also be satisfied the writing was made at a time when the events were fresh in the writer's mind and the witness must verify the writing's authenticity and truthfulness. Wigmore, 3rd ed., §§ 744–755; and see United States v. Riccardi, supra, footnote 12 and authorities cited there.

▮ The trial examiner here was very careful to ascertain that the witness had no present recollection of the statements contained in the affidavit, but that he did recall giving and signing it and that the statements were true at the time it was given. We think the affidavit was properly admitted for whatever light it might shed on the employer's purpose in granting the wage increases.

▮ This brings to focus the sufficiency of the evidence to support the Board's finding that by granting wage increases to its employees it violated 8(a) (1). The argument is that the company had a clearly established practice of granting increases every 12 to 15 months with a typical interval being 14 months; that the employees were expecting their increases and had been asking when they would receive them; and that the increases were granted 14 months after the last general increase—the normal interval. It further argues that even though the Board's decision on the Union's election petition was pending, the company had no way of predicting when a decision would be forthcoming and had it postponed the increases for another month (until after the decision) it might have been subjected to a charge that the increases had been withheld because of union activity.

It is important to recall that in the January 11 interviews the employer promised wage increases if the employees would reject the Union, and increases were granted in April when the employer told Miller (as reflected by his affidavit) that it hoped he "saw the light on the Union business and that a Union was not needed." The inherent danger in "well-timed increases" is that the "Employees are not likely to miss the inference that the source of the benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." N.L.R.B. v. Exchange

Parts, 375 U.S. 405, 409–410, 84 S.Ct. 457, 11 L.Ed.2d 435. It may be significant that the Union lost the election less than a month after the increases were granted. Indeed, the Board reasoned that "With a decision in the representation case imminent and the possibility of an election soon thereafter a matter of reasonable expectation" it was difficult to understand why the employer "felt impelled to grant the wage increases at the time it did"; that the increases could have been withheld for another month until after the election had been held and still have been granted within the customary span of time. From this the Board properly concluded that the increases "were reasonably calculated to, and did, interfere with the employees in the exercise of their freedom of choice in selecting or rejecting the Union as their collective bargaining representative and that by such conduct the [employer] violated § 8(a) 1." And see N.L.R.B. v. Stow Manufacturing Co., 2 Cir., 217 F.2d 900; N.L.R.B. v. Delight Bakery, Inc., 6 Cir., 353 F.2d 344, 347. And see also American Sanitary Products Co. v. N.L.R.B., supra; Betts Baking Co. v. N.L.R.B., 10 Cir., March, 1967, 380 F.2d 199; Crown Tar and Chemical v. N.L.R.B., 10 Cir., 365 F.2d 588.

■ We come now to our second crucial question, i. e. whether the Board properly found that the Union secured a valid card majority through the second set of authorization cards signed in February, as a prerequisite to the validity of the order to bargain. The employer asserts that the Board relied on three facts which are without support in the record, i. e. (1) that Cox spoke to all of the employees on January 11 evidencing his withdrawal from the Union movement; (2) that there was no evidence of coercion with regard to the second set of cards; and (3) that there was a sixty day interval between Cox's overt participation in the organization drive and the signing of the February cards. Argument is made that the record discloses that Cox spoke to no more than half of the employees on January 11 and that

the other employees at the time of signing the February cards still thought he was in favor of the Union; that while there was no affirmative evidence of coercion "from the [employer]", there was evidence that at least two employees signed the second cards under the influence of misrepresentations by the Union in that one was told the first card "wasn't legal because we did it on company time" and the other was simply asked to sign a second card because the first one was void. It is also argued that instead of a sixty day interval between Cox's participation and the signing of the second set of cards (roughly corresponding to the Board's sixty day posting period uniformly required to dissipate the effects of unfair labor practices), there was only about thirty days from the time the employees learned of Cox's "change of heart" and the signing of the cards—insufficient time to neutralize the effects of his unlawful conduct.

We think the Board properly rejected these contentions. Cox himself testified that he spoke to "all the employees that were there at the time". Moreover, "any expressions of company attitudes even to small groups of individuals, were likely to be rapidly disseminated around a plant during the struggle of organization." Irving Air Chute Company v. N.L.R.B., 2 Cir., 350 F.2d 176, 179. There was also testimony that Lenehan informed "The employees, all of us that was called into the office or the lunchroom" that the cards were void "owing to the fact that Mr. Cox knew these cards were being signed and being a supervisor". We agree with the Board's finding that "The interval of nearly two months which occurred between the signing of the first union cards and the signing of the second set * * * together with the other factors above set forth, warrant a determination that whatever coercive effect Cox's original conduct may have had, it was neutralized by the time the second set of union authorization cards were signed."

■ We thus are confronted with the employer's final contention that the

Board's bargaining order was an improper remedy in the absence of a finding of refusal to bargain. The Board expressly found that the Union's December bargaining demand was invalid; that no new demand had been made after the Union secured a valid majority; and that the employer was, therefore, not guilty of unlawfully refusing to bargain in violation of 8(a) (5). But, it concluded that since the unilateral wage increases were "designed to destroy" the Union's February majority, the employer "has disclosed a disposition to evade its duty to bargain as the Act requires, and it, therefore, appropriately may be required to bargain." And see Western Aluminum of Oregon, Inc., et al., 144 N.L.R.B. 1191.

The employer makes no contention that a finding of 8(a) (5) refusal to bargain is a prerequisite to a bargaining order. And see Piasecki Aircraft Corp. v. N.L.R.B., 3 Cir., 280 F.2d 575; Local No. 152 v. N.L.R.B., 120 U.S.App.D.C. 25, 343 F.2d 307. But, it urges that a bargaining order must be supported by "substantial evidence of the employer's intent to evade its duty to bargain"; that the Board's finding that the wage increases evinced such a necessary intent is without record support; and that such an "unaggravated" 8(a) (1) violation will not support the order to bargain. Reliance is placed on the Second Circuit case of N.L.R.B. v. Flomatic Corp., 347 F.2d 74, where the court refused to enforce a bargaining order entered to dissipate the effects of an 8(a) (1) violation. While conceding that a bargaining order might be entered in an 8(a) (1) case, the Court there felt that there must be "adequate justification" and that "restraint" should be exercised in the application of such "strong medicine" lest its potentially adverse effect on employees' § 7 right not to unionize and § 9 (c) (1) right to secret ballot election be overlooked. The Court implied at least that a bargaining order should be approved only in the case of the employer's "flagrantly hostile" conduct in a "broad gauged" anti-union campaign consisting of "glaring violations". And see also Bok, The Regulation of Campaign

Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 138 (1964).

The Flomatic case was distinguished in N.L.R.B. v. Delight Bakery, Inc., supra. In an opinion by Judge Edwards for the Sixth Circuit it was emphasized that the Flomatic majority relied heavily on the fact that, unlike Delight, the employer had not been requested to bargain and that the employer's acts had not caused the loss of the Union's majority. The very latest case on this point is N.L.R.B. v. Northwest Engineering Company and United Steelworkers of America, AFL–CIO, 376 F.2d 770, wherein the District of Columbia has aligned with and embraced the minority view in Flomatic on the grounds that the Board has the responsibility of deciding the most appropriate remedy for established unfair labor practices and that judicial interference is justified only for the clear abuse of discretion. Whatever may be said of the philosophical cleavage between the Circuits and the law review commentary, in our case the record fully supports the appropriateness of the remedy, for as we have seen, the wage increases clearly violated 8(a) (1) and were intended to and did interfere with the representation election. We see neither oppressiveness nor arbitrary remedial procedure in returning the parties to the status quo ante and requiring the employer to bargain with the majority representative of its employees.

There may be ambiguity, if not contradiction, in the Board's finding that the employer intended to "evade its duty to bargain" following, as it does, upon the heels of the finding that there was no duty to bargain, hence no unlawful refusal. But, we interpret it to mean that since the Union held a valid majority, if it made a demand, " * * * it would manifestly be the duty of the [employer] to recognize the union as [its] employees' bargaining agent", N.L.R.B. v. Caldarera, 8 Cir., 209 F.2d 265; and see Summit Mining Corp. v. N.L.R.B., 3 Cir., 260 F.2d 894, and that by unilaterally granting wage increases, the employer sought to

destroy the Union's majority and thus prevent the duty to bargain from arising. Under this interpretation, we think the Board drew a reasonable inference from the surrounding facts and circumstances.

Except as herein indicated, the Board's order will be enforced.