**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEWMAN–GREEN, INC., Respondent.**

No. 16598.

United States Court of Appeals Seventh Circuit.

Aug. 29, 1968.

**2**

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allen J. Berk, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Joseph A. Yablonski, Attys., N. L. R. B., Washington, D. C., for petitioner.

Karl W. Grabemann, Naphin, Sullivan & Banta, Chicago, Ill., for respondent.

Before SCHNACKENBERG, KILEY and CUMMINGS, Circuit Judges.

KILEY, Circuit Judge.

The Board seeks enforcement of its order, based on findings that respondent Newman-Green, Inc., violated Sec. 8(a) (1) of the National Labor Relations Act by coercively interrogating an employee and by granting employees a benefit on the eve of a representation election; violated 8(a) (2) (1) by assisting and supporting employee committees; and violated 8(a) (3) by discharging an employee for union activity. Respondent was ordered, so far as pertinent here, to cease and desist from the unlawful practices; to withhold recognition of the employee committees as bargaining agents unless and until certified by the Board; and to offer immediate and full reinstatement and back pay to the discharged employee. We deny enforcement of the order, except as to the 8(a) (1) violation with respect to the insurance benefit.

In 1962 Newman-Green was in the business of manufacturing and assembling aerosol valves, and employed a total of 180 people in three shifts, about 60 to 75 in each of the first and second shifts and 45 or 50 in the third. The Union [1] had been attempting to organize the plant for several years, but had lost elections at the plant in 1959, 1962, 1963 and 1964. In 1965 it lost another election by a vote of 148 to 38. Thereafter it filed unfair labor practice charges, the complaint issued, a hearing was had, and the Trial Examiner found the Sec. 8(a) (1), (2) and (3) violations. The Board adopted the findings and entered the order before us.

During the 1965 election campaign Newman-Green agreed to assume the full cost of a hospital insurance program which previously had been paid for by the employees. It posted a notice of this benefit on April 29, 1965. The election was held on June 25.

The Board found that Newman-Green violated Sec. 8(a) (1) of the Act by announcing and granting the insurance benefit to its employees in order to discourage union activities of employees, or, in any event, because Newman-Green's conduct reasonably tended to interfere with employees' freedom in the exercise of their rights. Newman-Green contends there is no substantial support in the record for this conclusion.

Newman-Green's employees had paid the entire cost of Blue Cross-Blue Shield hospitalization insurance since about 1962. In November, 1964, the insurer notified Newman-Green that the cost of the insurance would be increased 25%, and Walter O'Neill, Newman-Green's financial officer, was assigned to investi-

---

1. United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO.

gate terms of other insurers, with a view to Newman-Green's assuming the cost.[2] In February, 1965, O'Neill met with Lincoln National Life Insurance Company and later with Prudential and Metropolitan. All three insurers submitted proposals and in mid-April Newman-Green accepted a Lincoln Life proposal and informed Lincoln Life to take immediate action so that the insurance could be "put * * * into effect immediately." On April 29, 1965, Newman-Green posted a notice informing the employees that the new plan would be at no cost to them. The plan went into effect May 1, 1965, and early that month Lincoln Life representatives explained the plan to the employees.

Newman-Green argues that the decision to assume the cost of the insurance was made in late 1964, before the 1965 union activity; that it informed the employees of the decision in early February, 1965; and that the April notice was merely that the insurance plan, decided upon in November, 1964, was to be put into effect as of May 1.

It is uncontroverted that the employee committees had for several years requested Newman-Green to assume the cost of hospital insurance. The Board found that the 1964 decision was indefinite as to time; that no final decision was made until late April when Newman-Green knew the Union had resumed its organizational activity; and that the employer's June 18 campaign letter in which the employer discussed the benefits it gave its employees, including "a paid Health Insurance Policy," was anti-union and "very" significant.

█ It is our view that the record gives substantial support to the Board's conclusion. It could well have considered that the "decision" in November, 1964, was merely to investigate the cost to Newman-Green of a hospitalization insurance program and that the final decision was not made until late April, after the employer discovered that the Union had begun passing out organizational literature at the plant. The discussion concerning insurance which Mrs. Green had with employees in February could with reason have been considered by the Board as no more definite than the 1964 "decision." Finally, the Board was not required to accept Newman-Green's argument that the testimony that the delay in promulgating the insurance plan was due to unavoidable circumstances obviates the possibility that the April announcement was made for the purpose of discouraging employees' union activity or interfering with their organizational rights in violation of Sec. 7.

Newman-Green is charged with knowledge of the Act's concern about employee freedom in the exercise of organizational rights, and has offered no explanation of the timing of its announcement which would compel a Board finding that Newman-Green's action was not designed to effect the election. When the employer chose to announce the insurance program at the time and under the circumstances here, it took the risk that its conduct could justify the inference the Board drew, that the preparation of the insurance plan and its promulgation was timed to induce, or did induce, votes against the Union. Indiana Metal Products Corp. v. NLRB, 7 Cir., 202 F.2d 613, 620; NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S. Ct. 457, 11 L.Ed.2d 435.

█ We set aside the conclusion that the employer violated 8(a)(3) by discharging employee Fortune for reporting for work under the influence of alcohol. The record establishes that Fortune had been previously warned about drinking while at work and for making obscene telephone calls, and that he was again intoxicated on the job on the day he was fired. We think the Board had no substantial basis in the record for deciding that the reason given by Newman-Green for Fortune's discharge was a pre-

---

2. O'Neill testified that "Mr. and Mrs. Green said let's investigate with other group insurance companies and find out what kind of benefits we can get and figure on paying definitely on the situation of paying for the employee. * * * "

text which hid the real motive—his union activity. The clear evidence that Newman-Green had good reason for discharging him, along with the fact that the discharge came after the election at a time when another election could not be held for a year, weakens the basis for the Board's attributing an anti-union motive to the discharge. The General Counsel had the burden of proving, by substantial evidence, that Fortune's discharge was due to union activity, Indiana Metal Products Corp. v. NLRB, 202 F.2d 613, 616, and we think he did not meet that burden.

The Examiner considered together the charges that employee Fortune was unlawfully discharged and unlawfully interrogated, in violation of 8(a) (3) and 8(a) (1) respectively. It is obvious from the Examiner's "Analysis and Conclusions" in this part of his decision that the alleged unlawful interrogation was *de minimus* except as considered with the unlawful discharge. And it is obvious also that the finding of the 8(a) (1) violation for interrogating Fortune before the election rested on the 8(a) (3) discharge finding made immediately before. Since we have set aside the finding of an 8(a) (3) violation, we set aside the finding of an 8(a) (1) interrogation violation as also unsupported by the record. There is no indication in the record that Fortune's conversations with Shipley were anything more than normal, harmless exchanges between employees.

■ The General Counsel charged, with regard to the 8(a) (2) violation, that Newman-Green since February 16, 1965, assisted, dominated and contributed to the support of, and interfered with, the employee committees by assisting and directing the employees in the nomination and election of committee members, and that Newman-Green called employee committee meetings, on its time and property, to discuss wages, grievances, etc. The General Counsel had the burden of proving these charges. The Board concluded that the facts "clearly establish" that Newman-Green assisted and supported the committees in violation of 8(a) (2). The Board, however, also concluded that the evidence fell short of establishing domination because it "seems clear" that the committees function with at least some degree of independence.

The Board found that the employee committees were labor organizations within the meaning of the Act. This finding rested upon stipulation of the parties that wages, hours and conditions of employment were discussed at meetings attended by the committees and representatives of Newman-Green.

The ultimate facts upon which the finding of violation rests are that Newman-Green supplied employees with grievance forms, printed ballots for nomination and election of committee members, typed and posted election notices, released employees from work so that they might vote, and selected employees to act as overseers at the balloting.

■ The basic question before us is whether the General Counsel proved that Newman-Green violated 8(a) (2) by fettering the employees in the exercise of their Sec. 7 right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The Act does not prohibit the employer from granting employee requests where the subject matter or motive does not have this fettering effect, and assistance under 8(a) (2) does not, therefore, mean all and every assistance. Chicago Rawhide Mfg. Co. v. NLRB, 7 Cir., 221 F.2d 165. It could be that Newman-Green's labor relations would have suffered if Budi, Newman-Green's production manager in 1962, or Buchacz, its plant superintendent in 1965, declined to accommodate the employees, presumably mostly women, by granting the employee requests. We think that the General Counsel did not supply a substantial basis for the finding that what was done violated 8(a) (2).

It is not disputed that a majority of the "girls" did not want a union. They were free to make that decision, and to decide by majority vote that each shift should have its own committee for dealing with the employer. We disagree with Newman-Green that the Examiner should have credited Newman-Green officer O'Neill instead of employee Neumann as to whether President Green suggested the formation of the employee committees after the Union lost the 1959 election. No reason is given why Green was not called to refute Neumann, if the question was important on the issue as to who originated the idea of forming the employee committees. But assuming Green did suggest the idea of employee committees as Neumann testified, that fact does not show that the April, 1959, statement generated the April, 1962, decision of the employees to form their own committees.

The charges, relied upon before the Board by the General Counsel, were that Newman-Green aided and abetted the employees in the committee nomination and election in April, 1965, and that the committees met each month at the call of Newman-Green to discuss wages, etc. There is no evidence or finding that Newman-Green called the meetings. The Board found that the company posted committee election notices. We think this finding is clearly erroneous. Employees Neumann and Grossi, and Newman-Green witness O'Neill, gave vague testimony at the 1966 hearing concerning whether an employee or supervisor posted the 1962 notices. However, witness Buchacz, production manager in 1965, testified unequivocally that for the 1965 election covered by the charge he was requested by the employees to have the notices typed, that he did so, that he gave the notices to the employees and that they posted the notices on the bulletin board. The General Counsel did not on cross-examination inquire into Buchacz's direct testimony. The Examiner relied upon the absence of a denial by witness Budi that he signed the notice, in view of Neumann's testimony of her vague recollection that Budi signed the 1962 notices.

But Budi had nothing to do with the 1965 election. And Buchacz denied signing the 1965 notices. There is no substantial basis for the finding that Newman-Green signed and posted the notice.

The Board relies upon the absence of evidence that the committees have constitutions or by-laws, collect any dues, elect any officers or have any meetings with employees. This lack of evidence cannot be relied upon as substantial support for a finding that Newman-Green "assisted and supported the committees in violation of Sec. 8(a)(2)," in view of the General Counsel's burden of providing substantial evidence upon which such a finding can be made.

There remains only Newman-Green's compliance with employee requests that a stenographer take minutes of some meetings between the committees and the employer, that Budi's secretary type ballots for the committee election, that Budi's office be used as a polling place, that balloting take place on company time, and that Newman-Green supply paper on which nominations and grievances could be written. There is nothing of substance to show invidious motivation on Newman-Green's part, or a result which affected adversely the self-organization right of the employees. It is undisputed that the employees supervised the election, counted the ballots, and determined the winners without any interference from management.

The record does not give the impression that the committees are effective instruments for serving the statutory purpose of "labor organization"—as defined in the Act: " * * * 'labor organization' means any organization * * * or employee representation committee * * * which exists for the purpose, in whole or in part, of dealing with employees concerning grievances * * * wages * * * or conditions of work." But the majority of the employees have chosen the shift committees as their representatives and are free to do so, and the record does not give substantial support for any inference that Newman-

**6**

Green interfered with the employee freedom.

We deny enforcement of the Board's order, except that part which is concerned with the granting of the insurance benefit.

Order denied in part, enforced in part.

SCHNACKENBERG, Circuit Judge:

I would deny enforcement of the Board's order without exception.