NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

Isaac RUBIN and Marion Kane, d/b/a Novelty Products Co., Respondent.

No. 451, Docket 33820.

United States Court of Appeals, Second Circuit.

Argued March 31, 1970.

Decided April 17, 1970.

Julius Rosenbaum, Washington, D. C., Attorney (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Eugene B. Granof, Atty., on the brief), for petitioner.

Leon M. Labes, New York City (Auerbach & Labes, New York City, on the brief), for respondent.

Before KAUFMAN and FEINBERG, Circuit Judges, and TIMBERS, District Judge.*

FEINBERG, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order finding that respondents Isaac Rubin and Marion Kane, d/b/a Novelty Products Co., violated sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, and requiring them, inter alia, to offer reinstatement to all employees discriminatorily discharged or laid off and to cease and desist from the unfair labor practices found, including coercive interrogation and polling of employees. We enforce the order.

---

* Chief Judge of the District of Connecticut, sitting by designation.

Respondent Novelty Products manufactures military cloth equipment, principally bandoliers. In the first week in June 1966, a union[1] organizing campaign was initiated by employee Jose DeJesus, who passed out authorization cards in front of the company's building. On the morning of June 9, the union by telegram formally requested recognition as a bargaining agent. Evidently concerned at the organizational campaign, managing partner Rubin attempted to counter it. On June 8 and 9, he interrogated several employees, asking who was behind the union activity and who had signed cards and stating that he would have to "lay off or shut down the night shift" if the union got in. Garcia, a supervisor who dealt with the Spanish-speaking employees, also went through the shop with a pad in his hand making a survey of who had signed cards. On June 9, the company began firing and laying off employees. DeJesus and Amelia Ash, a female employee assisting him in soliciting cards, were discharged, the latter on June 11, after Rubin had twice interrogated her and told her that should "the union win. I have to close the shop because I don't have money." On June 9 and 10, the entire night shift of approximately 30 employees and 13 of the day shift were laid off. When an employee inquired why, Rubin responded that it was to let him "get this union business straightened out."

■ The Board found that the discharges, layoffs and threats violated sections 8(a) (1) and 8(a) (3) of the Act. These findings were amply supported by the extensive record. Although DeJesus was allegedly fired for lack of work, there was evidence that this was not the case, and that Rubin knew that DeJesus was the principal union organizer. Ash was allegedly discharged for quarreling with Garcia, the Spanish-speaking supervisor; there was evidence, however, that this was not so, but that Ash was terminated after predicting a union victory to Rubin.

■■ The company offered testimony that the mass layoffs were due to the lack of tape for the bandoliers and argues strenuously to us that it cannot be compelled to employ people that it cannot use. Of course this is true, but the question before the Board was whether the given reason for the layoffs was the true one or whether anti-union bias played a substantial part. J. P. Stevens & Co. v. N. L. R. B., 380 F.2d 292, 300 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). The evidence that the company had run out of tape was ambiguous; indeed, there was contrary evidence that its situation was not much different from earlier weeks before the union appeared when there were no layoffs. Significantly, there was testimony that Rubin threatened mass layoffs in order to block the union. All of this, together with the stunningly obvious timing of the layoffs, was more than sufficient to support the inference chosen by the Board that the layoffs were intended to have coercive anti-union effect.[2]

■ The company disagrees with most of the findings set forth above, not just the most significant ones such as the reason for the layoffs, but many of the subsidiary findings as well; e. g., Garcia is continually referred to as merely "the Company mechanic."[3] The point is also emphatically made to us that on some issues, e. g., the reinstatement of DeJesus, the Trial Examiner was overruled by the Board, thus proving that the Board was out to "get" the company. We have considered all of the company's arguments and have reviewed

1. Electrical Production & Novelty Workers Union, Local 118, International Union of Dolls, Toys, Playthings, Novelties & Allied Products of the United States and Canada, AFL–CIO.

2. The company also argues that the Board, in any event, should not have reinstated an employee who was laid off while on sick leave or two workers who the company alleged had resigned. There was substantial evidence to support the Board's finding that these employees were discriminatorily laid off.

3. E. g., respondents' brief, pp. 55, 56.

the record. The case primarily involved credibility resolution by the examiner or the drawing of allowable inferences well within the Board's power and expertise. While the Board did overrule the Trial Examiner in some respects, this does not justify refusing to enforce its order. Reasonable men could perhaps differ on some of the findings made by the Board, but we do not see how we can fairly characterize them as not supported by substantial evidence. In short, except for one aspect of the Board's order, we would enforce it without further comment.

 The portion of the order referred to prohibits respondents from coercive interrogation and polling of employees. The company claims that it did not violate the Act in this respect and relies upon Bourne v. N. L. R. B., 332 F.2d 47 (2d Cir. 1964). It is true that not all of the indicia of coercive interrogation outlined in *Bourne* were present here; this aspect of the case is admittedly close. See N. L. R. B. v. Milco, Inc., 388 F.2d 133 (2d Cir. 1968). But on at least three occasions when Rubin interrogated employees, he also made threats of plant closure or layoffs. Thus, while there was no record of past discrimination, the inference of coercive atmosphere was as strong as one would have from a lengthier history. Compare *Milco, supra,* 388 F.2d at 137. Moreover, most of the interviews were conducted by Rubin, the top man in the plant. On several occasions, employees were asked their individual position as to the union, or who was leading the drive. On one occasion an interview took place in an atmosphere of some formality, and the sight of Garcia with a pad was obviously impressive. We believe that under all the circumstances, the *Bourne* standards were met. Accordingly, we do not have to deal with the scope and force of the rules laid down by the Board with regard to polling of employees in Struksnes Construction Co., 165 N.L.R.B. No. 102, 65 LRRM 1385 (1967), recently cited with approval by the Supreme Court in N. L.

R. B. v. Gissel Packing Co., 395 U.S. 575, 609, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). See N. L. R. B. v. Lorben Corp., 345 F.2d 346, 350 (2d Cir. 1965) (dissenting opinion); N. L. R. B. v. C & P Plaza Department Store, 414 F.2d 1244, 1249 n.2 (7th Cir. 1969).

Order enforced.