**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**GLADDING KEYSTONE CORPORA-TION, Respondent.**

**No. 183, Docket 34924.**

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1970.

Decided Dec. 29, 1970.

Frank H. Itkin, Atty., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Russell J. Thomas, Jr., Attys., on the brief), for N. L. R. B.

William L. Bergan, Syracuse, N. Y. (Bond, Schoeneck & King, Francis D. Price, Syracuse, N. Y., on the brief), for respondent.

Before SMITH and FEINBERG, Circuit Judges, and LEVET, District Judge.*

FEINBERG, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order, which found that Gladding Keystone Corporation interrogated an employee concerning union activities in violation of section 8(a) (1) of the Labor Act and both threatened to, and actually did,

---

* Of the Southern District of New York, sitting by designation.

discriminatorily discharge an employee for his organizational activities in violation of sections 8(a) (1) and (3) of the Act. The Board's order required respondent to cease and desist from the unfair labor practices found, to offer reinstatement to the discharged employee, and to post the usual notices. For the reasons set forth below, we enforce the Board's order.

## I.

The Board found that respondent had violated the Act with respect to two employees. The alleged violations with respect to Aaron Seward arose in the following context. Seward was hired in April 1968 to work in the maintenance department. Although his performance on at least one of his tasks there was "very good," the company acceded to Seward's continual requests for work involving drafting and transferred him in May to work in the quality control department.

In early July, Seward contacted a representative of the International Association of Machinists and solicited employee signatures for union authorization cards. During this solicitation, Seward received a signed card from Eugene Heller, a supervisor in the stock room. Heller was subsequently admonished by Bernard O'Neil,[1] the president of the company, to "start acting like [a supervisor] * * *" and instructed that the company could not afford a union. Heller then requested the return of his signed card and tore it up in Seward's presence. Heller also stated that the company was aware of the organizational activities and, if it connected Seward with them, it would probably fire him.

Several days later, Seward was confronted by an alleged supervisor,[2] Richard Svatek, and told that bad reports had been circulating about him. Svatek added "you're the leader in organizing the Union in the plant. I just want to warn you, you know you can get fired on account of this." Finally, on July 15, quality control manager Robert Bligh called Seward into his office and informed him that he was being terminated because of lack of work in his area and a need to cut down expenses. Bligh did assure Seward that he could be rehired. But he answered Seward's request for other work in the plant in an evasive manner, first stating that the only work available was of a variety Seward would not want and then, in response to Seward's statement that he would be willing to do such a job, stating that the job had already been filled.

Seward returned to the plant two days later to check with Bligh about reemployment. While waiting to see Bligh, Seward conversed with Svatek. Svatek stated: "I told you, didn't I tell you you'd get fired for monkeying with the Union?" Svatek added that the alleged lack of work was not the real basis for Seward's termination, but was only rhetoric necessitated by the law against firing anyone on account of union activities.

On this factual basis the Board found that the company, through Eugene Heller, had threatened Seward with discharge if Seward continued to support the union, thereby violating section 8 (a) (1). It also found that respondent had violated sections 8(a) (3) and (1) by discharging Seward on account of his union activities. Gladding Keystone raises several objections to these findings.

As to the alleged threat to Seward, respondent points out that Heller, a witness called by the General Counsel, denied on cross-examination ever threatening any employee with dis-

---

1. The examiner, the Board, and the Board's brief in this court all spell the president's name with one "l." Respondent's brief uses two. In ignorance of which spelling is correct, we have opted for the former.

2. Svatek's supervisory status is contested by respondent and will be discussed below.

charge for union activities. Likewise, respondent refers to the trial examiner's suggestion during the hearing that insufficient proof of the threat had been proffered. Nevertheless, we conclude that there is substantial evidence to support the Board's finding that Seward was threatened with discharge for his union activities. Heller's hasty reversal of his support for the union, coupled with his statement indicating the company's intention to take action against union adherents, provides an adequate, although less than overwhelming, basis for the Board's finding.[3]

Gladding Keystone also disputes the Board's finding that Seward was discharged because of his organizational activities in violation of section 8(a)(3). Its first challenge is to the Board's finding that Richard Svatek was a supervisor, which made the company responsible for his statements to Seward.[4] Respondent alleges that the trial examiner incorrectly relied on the company's stipulation in a representation hearing, held in the month following Seward's discharge, that Svatek was a supervisor. Respondent claims that Heights Funeral Home, Inc. v. NLRB, 385 F.2d 879 (5th Cir. 1967), mandates relitigation of Svatek's status. Respondent's reliance on Heights Funeral Home is misplaced, however, for the trial examiner did allow the company to proffer testimony that Svatek was not a supervisor. His ultimate finding, which accorded greater weight to the representation hearing stipulation and the company's failure to deny that Svatek did have the supervisory power of disciplining employees

than to the testimony of respondent's witnesses, is both supported by substantial evidence and fully consonant with Heights Funeral Home. See id. at 882.

Gladding Keystone also argues that its major defense to the discriminatory firing charge, economic necessity, was given short shrift by the Board. It states that two other employees were discharged or transferred at the same time Seward was terminated and that the company has not hired replacements. Respondent also suggests that the Board improperly relied on the company's position in opposition to an election at the representation hearing. The examiner noted that the company then stated that the unit was being expanded and more employees were being hired. However, respondent points out that the number of employees in Seward's particular department had plummeted from 21 to nine. Finally, respondent argues that Seward could not have been transferred to another department for he had earlier threatened to quit unless he was given drafting work.

■ Respondent's points do indicate that the General Counsel's case was not overly strong. But respondent fails to acknowledge the restricted nature of this court's power to review the Board's determination of employer motivation, the gravamen of a section 8(a)(3) violation. Moreover, the existence of a lawful cause for discharge does not insulate an employer from a determination that it violated section 8(a)(3) if the Board makes a finding, supported by substantial evidence, that the discharge was at least partially because of union activi-

---

3. Respondent's other challenges to the Board's finding are without merit. We find that the alleged procedural irregularities, viz., the NLRB's eleventh hour amendment of its complaint and the general counsel's leading of witness Heller, are insufficient to warrant reversal of the Board's determination. Likewise, respondent's reliance on Dayton Food Fair Stores, Inc. v. NLRB, 399 F.2d 153 (6th Cir. 1968), cert. denied, 393 U.S. 1085, 89 S.Ct. 871, 21 L.Ed.2d 778 (1969), is misplaced. In Dayton, the supervisor

was a close friend of the allegedly threatened employee and was sympathetic to the union campaign.

4. The examiner referred to two conversations between Svatek and Seward, one on July 13, 1968, and the other on July 17. The examiner admitted at least the first and possibly also the second only for the purpose of showing the company's awareness of organizational activities.

ties. NLRB v. Dorn's Transportation Co., 405 F.2d 706, 713 (2d Cir. 1969); J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 300 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967). Thus, the Board's finding of discriminatory motivation here cannot lightly be overturned on review. We hold that there is substantial evidence on the record that respondent fired Seward at least partially because of his union activities, thereby violating section 8(a)(3).

## II.

The alleged section 8(a)(1) violation with respect to employee Herman Zeidner arose out of a conversation between Zeidner and company president Bernard O'Neil. Zeidner was working overtime on the Saturday immediately preceding the firing of Seward when O'Neil called him into his office. O'Neil stated that Zeidner had been seen handing out union cards which was "illegal and immoral." When Zeidner replied that he was unaware of cards being signed on company time and asked what was immoral about the procedure, O'Neil replied that it was "stabbing the company in the back." During the ensuing conversation, O'Neil showed schedules of proposed wage increases and asked Zeidner what he thought of them. Zeidner replied that the schedules looked good, but that he thought the union was good both for the employees and the company. On this factual basis, the Board found that respondent had violated section 8(a)(1) because

> O'Neil called Zeidner from his work station and interrogated him in his office as to how he felt about the Union, no assurances against reprisals were given, nor was any legitimate purpose served by the interrogation, and O'Neil clearly indicated his hostility to the Union.

The standards for determining whether an alleged interrogation violates section 8(a)(1) have been phrased in this circuit somewhat differently from those the Board apparently applied here. In

Bourne v. NLRB, 332 F.2d 47 (2d Cir. 1964), this court outlined five important considerations:

> (1) The background, i. e. is there a history of employer hostility and discrimination?
>
> (2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
>
> (3) The identity of the questioner, i. e. how high was he in the company hierarchy?
>
> (4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?
>
> (5) Truthfulness of the reply. [A truthful reply supports the inference that the interrogation did not inspire fear.]

*Id.* at 48.

The O'Neil-Zeidner conversation easily meets indicia (3) and (4). O'Neil was the company's highest officer and represented its policy towards the union, and Zeidner was called off his work station to answer questions in "the boss's office." As to consideration (2), in stating to Zeidner that he had been "seen handing out union cards to be signed," O'Neil did appear to be seeking confirmation of information which would provide a basis for taking action against an individual employee. However, indicia (1) and (5) do not indicate a violation. The case, therefore, is a close one, as so many of this type are. Nevertheless, none of the *Bourne* criteria is by itself controlling, nor is it necessary that all five "indicia of coercive interrogation" be present in each case. NLRB v. Rubin, 424 F.2d 748, 751 (2d Cir. 1970). See Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 111 (1964) ("Under the * * * approach [of the Second Circuit] * * *—with a variety of factors to be taken into ac-

count—the number of distinct fact situations is almost infinite."). On balance, in view of the strong language, e. g., "stabbing * * * in the back," used by the president of the company in his own office, we think that the examiner could find a violation here. Cf. NLRB v. Milco, Inc., 388 F.2d 133, 137–38 (2d Cir. 1968). Accordingly, although we might have reached a different result in the first instance, we do not believe that under our limited power to review, we should overrule the Board.

Enforcement granted.