**J. J. NEWBERRY CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 602, 603, Dockets 35295, 35430.**

United States Court of Appeals, Second Circuit.

Argued March 10, 1971.

Decided April 28, 1971.

William A. Harding, Lincoln, Neb. (Nelson, Harding, Marchetti, Leonard & Tate, John E. Tate, Lincoln, Neb., on the brief), for petitioner.

Kenneth Todd Pearlman, Atty., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., Washington, D. C., on the brief), for National Labor Relations Board.

Before HAYS and FEINBERG, Circuit Judges, and CURTIN, District Judge. *

FEINBERG, Circuit Judge:

J. J. Newberry Co., Inc. petitions for review of a National Labor Relations Board order which found that the company suspended a system of wage review during a union organization campaign in violation of sections 8(a) (3) and (1) of the National Labor Relations Act and both interrogated an employee and threatened to close a warehouse if the employees chose the union in violation of section 8(a) (1) of the Act. The Board cross-petitions for enforcement of its order. For the reasons set forth below, we decline to enforce the Board's order.

## I.

The alleged violations with respect to suspension of wage review during the union campaign arose in the following context. Prior to the campaign, the company had an established policy of periodic performance review at its Omaha, Nebraska warehouse.[1] An employee was first reviewed approximately 30 days after employment to determine whether he was progressing satisfactorily and whether he should be reassigned to a new job. No changes in his wage rate were made at this time. Thereafter, the company reviewed the work performance and wage rate of each employee every six months, although the timing might vary by several months. Wage increases were based on merit and were therefore neither automatic nor uniform, although it appears that an employee who performed his work satisfactorily could reasonably expect a wage increase after the six months review. If no increase were forthcoming, an explanation would be given.

On May 1, 1969, the General Drivers & Helpers Union, Local 554[2] sent a letter to Newberry announcing its organization campaign at the warehouse. The letter asserted that the union would file a petition for election as soon as it received sufficient employee support and stated that:

You are further advised that, pursuant to the National Labor Relations Act, as amended, during the period of organization of employees, an employer may not discriminate against such employees as to terms and tenure of

---

* Of the Western District of New York, sitting by designation.

1. Although the alleged unfair labor practices occurred in Nebraska, this court has jurisdiction over the instant proceedings because the company maintains a warehouse in New York. 29 U.S.C. § 160(f).

2. The Local is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

employment because they desire to form, join or assist a labor organization. If any such discrimination occurs, prompt action will be taken by the Union filing unfair labor practice charges with the National Labor Relations Board for violation of any of the protected rights of employees under the Act. We hope this will not be necessary, and that during this period the rights of all parties will be protected.

Upon advice of counsel, warehouse manager Edward Romine posted a copy of the letter on the employee bulletin board and suspended the wage review system. In several cases he told employees that they deserved wage increases but that he was unable to grant increases until the union issue was settled.

On this factual basis the Board found that the company had violated sections 8(a) (3) and (1) of the Act and ordered the company to make whole all employees for any loss suffered by suspension of wage review. It reasoned that the company's well-established duty was to decide the question of granting or withholding benefits as if there were no organizational activities pending:

> An employer's legal duty in deciding whether to grant benefits while a representation case is pending is to determine that question precisely as he would if a union were not in the picture. If the employer would have granted the benefits because of economic circumstances unrelated to union organization, the grant of those benefits will not violate the Act. On the other hand, if the employer's course is altered by virtue of the union's presence, then the employer has violated the Act, and this is true whether he confers benefits because of the union or withholds them because of the union.

McCormick Longmeadow Stone Co., 158 N.L.R.B. 1237, 1242 (1966). The Board also suggested that the company's statements that wage review would have to be held in abeyance until the union issue

was settled sought to place responsibility for the hiatus in wage review on the union, and thereby attempted to discredit the union and discourage membership.

One weakness in the Board's argument lies in its assumption that the company would necessarily have protected itself by conducting its normal wage review. The company correctly points out that the Board's own position on this issue is hardly as clear as the language quoted above might indicate. In J. C. Penney Co., Inc., 160 N.L.R.B. 279 (1966), enforced, 384 F.2d 479 (10th Cir. 1967), for example, the company normally granted wage increases at 12–15 month intervals. Nevertheless, the Board adopted a finding of the trial examiner that a wage increase 14 months after the preceding one violated section 8(a) (1) of the Act:

> With a decision in the representation case imminent and the possibility of an election soon thereafter a matter of reasonable expectation, I find it hard to understand why the Respondent felt impelled to grant the wage increases at the time it did. As matters actually developed, had the Respondent withheld action for another month, the election would have been held and the Respondent would have granted the wage increases within the span of time it customarily followed. * * *

160 N.L.R.B. at 284. Such a holding contrasts sharply with the Board's position in other cases, e. g., Montana Lumber Sales, Inc., 185 N.L.R.B. No. 12 at 8 (1970):

> We have held that, where an Employer has made clear in its campaign statements that its only reason for postponing expected benefits was to avoid the appearance of election interference, its action did not constitute objectionable conduct sufficient to set aside an election.

See generally Perl, Granting of Benefits During a Representation Election: Validity of NLRB General Rule, 18 Lab.L. J. 643 (1967).

It is just this kind of ambiguity which prompted this court's ruling in NLRB v. Dorn's Transportation Co., 405 F.2d 706 (2d Cir. 1969). In *Dorn's*, the company suspended periodic wage review during a union organization campaign. The Board reversed the trial examiner and found that the suspension violated section 8(a) (1). This court denied enforcement, reasoning that because the company was prohibited from unilaterally granting economic benefits during the organization campaign, NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1963), the Board's holding placed the employer in a "damned if you do, damned if you don't" position. The court suggested that a violation could only be found where the employer was illegally motivated rather than acting in a "good faith effort to conform to the requirements of the law." 405 F.2d at 715.

The trial examiner and the Board obviously did not feel themselves bound by *Dorn's*.[3] We, however, are unless that case is distinguishable. The Board argues that it is, because in *Dorn's* there was no well-established policy of granting wage increases at periodic intervals and because the employer there did not speak to a number of employees or so specifically attribute the suspension of its policy to the union campaign. But in *Dorn's*, it appears that "the Company ordinarily reviewed salary increases during the latter part of the year * * *." 405 F.2d at 712. Moreover, the remarks there were made to two employees and were similar in substance to those made here. Accordingly, we believe that *Dorn's* fairly applies to this case.

■ An employer's dilemma is particularly obvious in a situation where, as here, wage reviews are fairly regular but the wage increases are subjective and discretionary. In such a case, under *Dorn's*, we should not enforce the Board's order absent a finding, supported by substantial evidence, that the company was illegally motivated and did not act in a "good faith effort to conform to the requirements of the law." No such finding was made here, since the examiner appears to have viewed the company's decision to withhold normal wage review pending the election as a per se violation of the Act. We hold that on this record there is not substantial evidence to support a finding that the company failed to make a good faith effort to conform to the requirements of the law.[4]

II.

The two other alleged violations concerned conversations between management personnel and employees. In one of them, warehouse manager Romine called employee Doris Larson to his office. The conversation commenced with Romine's observation that he had heard that Mrs. Larson was for the union. Mrs. Larson replied forthrightly that she was for the union if it would bring better wages and working conditions. Later in the conversation Romine stated that he knew Mrs. Larson deserved a raise but that none could be given until the union matter was settled.

■ Although the Board admitted that Romine's opening remark was not even put in the form of a question, it nevertheless found that the conversation

---

3. The trial examiner stated that:

The one case cited by Respondent which may be read as supporting its position is N. L. R. B. v. Dorn's Transportation Company, Inc., 405 F.2d 706 (C.A. 2). Assuming that case to be indistinguishable, it is plainly contrary to Board precedent which I am required to follow until such time as the Board or the Supreme Court holds to the contrary. [Citations omitted.]

4. Although not cited to us by the parties, we note NLRB v. Dothan Eagle, Inc., 434 F.2d 93 (5th Cir. 1970), which involved the withholding of previously automatic wage increases and obvious discrimination between employees subject to union organization and those who were not. For these reasons, the case is clearly distinguishable.

constituted coercive interrogation in violation of section 8(a) (1). The trial examiner appeared to rely heavily on the fact that "nothing in the circumstances of the case justified such interrogation." The standard applied in this circuit is not, however, so simple. In Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964), we held that interrogation, not itself threatening, is not an unfair labor practice unless "fairly severe standards" are met, including:

(1) The background, i. e. is there a history of employer hostility and discrimination?

(2) The nature of the information sought, e. g., did the interrogator appear to be seeking information on which to base taking action against individual employees?

(3) The identity of the questioner, i. e. how high was he in the company hierarchy?

(4) Place and method of interrogation, e. g., was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?

(5) Truthfulness of the reply. [A truthful reply supports the inference that the interrogation did not inspire fear.]

See also NLRB v. Gladding Keystone Corp., 435 F.2d 129 (2d Cir. 1970); NLRB v. Rubin, 424 F.2d 748 (2d Cir. 1970). The instant interrogation appears to meet indicia (3) and (4). But it is significantly deficient with respect to the others. There was, for example, no evidence of a history of employer hostility. Likewise, employee Larson's straightforward reply hardly supports an inference of fear. But perhaps most important, the conversation entirely lacks the air of interrogation. Since wage review was to be stopped for all employees, not just union adherents, Romine's opening statement cannot be seen as seeking information on which to base action against individual employees. It should also be noted that the conversation is devoid of the usual queries as to the sentiments of other employees. In short, the circumstances of this one conversation fall short of the coercion we found existed in *Gladding Keystone*, *supra*, and *Rubin*, *supra*. We hold that there is not substantial evidence on the record to support a finding of illegal interrogation under the *Bourne* criteria.[5]

■ The other conversation at issue took place between general foreman Bill Compton and employee Jerry Taylor while a truck was being loaded or unloaded. Compton remarked that the company was considering closing its New York warehouse and, when Taylor asked why Compton replied, "because the union is too demanding." The Board reasoned that "[t]his statement, made just a week before the scheduled Board election at the Omaha warehouse, was plainly a threat that the Omaha warehouse might be closed if the employees selected union representation," and found a violation of section 8(a)(1). There is no question that Compton's remarks were ill-chosen. Nor would we hesitate to enforce the Board's order had they occurred against a background of anti-union animus. But in light of the isolated nature of the conversation and the company's otherwise circumspect conduct, we find the violation *de minimis* and decline to enforce the Board's order.

Enforcement denied.

5. We need not, therefore, deal with the company's argument that "this portion of the Complaint was specifically withdrawn by the General Counsel * * *."