**FREE–FLOW PACKAGING CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 75–2772.**

United States Court of Appeals, Ninth Circuit.

Jan. 4, 1978.

John C. Cook (argued), of Cook & Voltz, San Francisco, Cal., for petitioner.

Anne Liblun (argued), San Francisco, Cal., for respondent.

Before MERRILL and GOODWIN, Circuit Judges, and HOFFMAN,* District Judge.

MERRILL, Circuit Judge:

Petitioner seeks to have an adverse order of the National Labor Relations Board set aside. The Board cross-petitions for enforcement of its order.

In August, 1973, employees at petitioner's South San Francisco manufacturing plant evinced interest in union representation by the Leather, Plastics and Novelty Workers Union, Local No. 31, and eleven out of fourteen employees signed authorization cards. On union petition a representation hearing was held in September, and an election was set for November 2, 1973. The Board's order deals with occurrences during the period before this election.

The Board held that Free-Flow Packaging Corporation (the company) had committed the following unfair labor practices:

1.  It had violated § 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by discharging five employees prior to the election.

2.  It had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by denying the employees, prior to the election, a wage increase that past practice and assurances had caused them to expect.

3.  It had violated § 8(a)(1) of the act by coercively interrogating the employees about their union sympathies and anticipated vote by promising benefits if the union were rejected and threatening job loss if the union came in.

The order requires the company to cease and desist from the unfair labor practices found and to offer reinstatement and back pay to the discharged employees.

1.  *The Discharges*

██ The facts, as found by the Administrative Law Judge, were as follows:

The company manufactures an extruded polystyrene cushioning material. This material is extremely light and bulky and is used as a packaging material to cushion fragile items in shipment.

In July of 1972, the company was under a requirements contract to supply this material to the federal government. The contract estimated that 8,750 cases would be ordered during its twelve-month term. The company's management understood that, despite the estimated quantity specification, the contractor would be obligated to fill all orders submitted within the twelve-month period. In fact, during the contract's term, orders for 31,390 cases were placed. Under the contract these orders had to be filled within a specified period or default penalties could be imposed.

Since the company's production facility was a relatively small one, employing only

---

* Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

three men per shift on a three-shift, five-day basis, it was overwhelmed by receiving orders for 31,390 cases when only 8,750 had been anticipated. As a result, deliveries fell significantly behind schedule.

On June 22, 1973, the General Services Administration wrote to the company enclosing a "preliminary Notice of Default," and called attention to "the penalties which may be invoked in the event the decision is made to terminate your right to proceed." It stated further that, unless a satisfactory explanation was furnished, "we will have no alternative but to terminate your right to proceed with the performance of the above-mentioned orders."

The Administrative Law Judge found that under the threat of termination of the contract and the onerous penalties which would result from termination the company's president, Arthur Graham, decided to increase production by hiring more employees and going to a seven-day operation. The judge stated:

"President Graham testified—without challenge or contradiction—that despite certain foreseeable financial burdens, Respondent wished to forestall default: 'because of two things: first, it might well have disqualified us from continuing to bid on future orders or requirements of the GSA and, secondly, the penalty for default is quite severe. And it might well have involved a more serious economic loss to us, to have been found in default, than was involved in continuing to fill the orders.'"

In the early part of September, 1973, after the union filed its petition but before the hearing directing the election, the employer commenced operating on a seven-day per week, four-shift basis for the sole purpose of avoiding default penalties.

On September 17, 1973, a pre-election hearing was held at the San Francisco offices of the National Labor Relations Board. At that hearing respondent objected to the timing of the election, noting that as soon as the backlog of government orders had been met the unit would return to its historic size and five or six employees would be terminated. The Regional Director noted the employer's objection as follows: "The Employer contends that the present complement of 18 unit employees is not representative, the unit having been temporarily expanded in order to meet an unexpectedly large number of orders placed just prior to the recent termination of a GSA contract." The Regional Director did not question the employer's motive for expansion but overruled objection and directed an election for November 2, 1973.

After but a few weeks on the seven-day operation, it became evident to the company that the risk of default penalties was not sufficient to justify the costly and inefficient seven-day operation. First, it is undisputed that the seven-day operation had proven impractical and the Administrative Law Judge so found. It did not provide any opportunity for regular maintenance of equipment and, as a result, costly down time was experienced. Further, with the additional five employees it had significantly increased payroll and overtime costs to the employer without a proportional increase in productivity. The Administrative Law Judge credited the testimony of Warren McCandless, the company vice-president, who stated that but for the fear of default penalties they would never have shifted from a five-day to a seven-day week.

On or about October 1, 1973, President Graham learned of a decision of the United States Comptroller General holding that where the government had grossly exceeded its estimated quantities on a requirements contract, and where economic conditions were such that demanding delivery of all quantities ordered would impose a hardship on the contractor, penalties for default were not to be imposed. Upon confirmation of the existence of this decision, Graham decided to terminate the seven-day operation. The company thereupon terminated the employment of five persons on the basis of seniority. These discharges form the basis for the violation charged by the Board.

The Administrative Law Judge found that there was no evidence from which to conclude that the employer had violated the Act by resuming its normal five-day operation. The Board, however, overruled the judge and found, instead, that the company had returned to its normal five-day week pursuant to a plan to secure a company victory in the election by eliminating five employees who, presumably, would vote for the union, and adding four management employees who, would, presumably, vote against the union. This had been the theory argued by General Counsel before the Administrative Law Judge and had been rejected by the judge. In his opinion he had stated:

> "General Counsel's suggestion that Respondent's October layoffs were effectuated consistently with some 'plan to gerrymander' whereby the prospective representation vote's 'numerical dynamics' would be favorably modified, derives from his deductive inference merely; neither direct testimony, nor documentary proof, can be found within the present record, sufficient to warrant a factual determination that Respondent's management specifically considered; formulated or consummated such a plan."

We agree with the judge's assessment of the record and conclude that as a whole it does not provide substantial support for the Board's decision. The Board order as to this violation is not entitled to enforcement.

### 2. Withholding of Wage Increases

The Board contends that by past practice and assurances the company employees at the South San Francisco plant had been led to expect an annual across-the-board increase on October 1 of each year; that in 1973 the wage increase was canceled for the purpose of affecting the outcome of the election.

The company's main office was located in Redwood City, California, in a building that it shared with another company, Safe-T Pacific. Arthur Graham, president of the petitioner company and the company's sole shareholder, was also the president and major shareholder of Safe-T Pacific. That company had a collective bargaining agreement with the International Longshoremen's and Warehousemen's Union which represented certain employees at Safe-T Pacific's Redwood City location. That collective bargaining agreement provided for annual October 1 across-the-board wage increases. There was testimony from an employee of petitioner company that in 1971, at an employee meeting, Vice-President McCandless assured those present that the company would grant them the same annual wage increases as were provided by contract to the employees of Safe-T Pacific. McCandless categorically denied having made such a statement.

The Board contends that in 1971 and 1972 across-the-board wage increases were granted by the company consistent with the assurances attributed to McCandless. The company disputes this. It contends that while in 1971 and 1972 some employees received wage increases they were not general or across the board, or identical in amount as to all employees, or fixed to correspond to increases granted by Safe-T Pacific. The record indicates that while 1972 raises were granted as of October 1, raises in 1971 were granted as of November 15. Further confusing the picture is the fact that the company asserts that while no general October 1, 1973, wage increase was given, all employees of the South San Francisco plant had received increases earlier in 1973 based on meritorious performance and job reclassification.

McCandless testified that when approached by employees with reference to a general wage increase in the fall of 1973 he sought advice from the company attorney, and was advised that, in the absence of some more clearly established prior commitment to a raise, the granting of an increase in the face of the pending election would, in all probability, trigger an unfair labor practice charge by the union, and that in the light of past decisions the Board would most likely find that the raise constituted an attempt to affect the outcome of the election. On this advice McCandless refus-

ed to grant a raise at that time. Employees who inquired were advised that no raise would be granted in October, since to do so prior to the election would constitute an unfair labor practice.

█ Certainly the law is well established that a presumption of illegal motive adheres to wage increases granted prior to an election. *NLRB v. Newman-Green, Inc.,* 401 F.2d 1 (7th Cir. 1968), 69 L.R.R.M. 2129; *NLRB v. Pandel-Bradford, Inc.,* 520 F.2d 275 (1st Cir. 1975) 89 L.R.R.M. 3195. In the case of *Baltimore Catering Co.,* 148 N.L.R.B. 1107, the Board stated:

"In the absence of evidence demonstrating that the timing of the announcement of changes in benefits was governed by factors other than the pendency of the election, the Board will regard interference with employee freedom of choice as the motivating factor. The burden of establishing a justifiable motive remains with the Employer."

In the case of *J. C. Penney Co., Inc.,* 160 N.L.R.B. 279, 62 L.R.R.M. 1597, *enf'd* 384 F.2d 479 (10th Cir. 1967), the Board stated:

"With a decision in the representation case imminent and the possibility of an election soon thereafter a matter of reasonable expectation, I find it hard to understand why the Respondent felt impelled to grant the wage increases at the time it did. As matters actually developed, had the Respondent withheld action for another month, the election would have been held and the Respondent would have granted the wage increases within the span of time it customarily followed * * *."

160 N.L.R.B. at 284.

The Board relies on the rule that an employer interferes with his employees' freedom of choice, in violation of § 8(a)(1) of the Act, by withholding well established or previously promised benefits because of a union organizing campaign or the pendency of a Board representation election. *NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 97–98 (5th Cir. 1970); *NLRB v. Dan Howard Mfg. Co.,* 390 F.2d 304, 307 (7th Cir. 1968). The court in *Dothan Eagle, Inc.,* stated:

"At first glance it might appear that the employer is caught between the proverbial 'devil and the deep blue sea.' It is an unfair labor practice to grant a wage increase during the campaign and bargaining periods, but at the same time it may be an unfair labor practice to refuse to grant an increase during this same period. * * * We find little merit in such arguments. The cases make it crystal clear that the vice involved in both the unlawful increase situation and the unlawful refusal to increase situation is that the employer has *changed* the existing conditions of employment. It is this *change* which is prohibited and which forms the basis of the unfair labor practice charge."

434 F.2d at 98.

█ We agree with that statement of the law. But it is not always easy to ascertain the applicable status quo. It is not always clear to the employer whether a wage increase would conform to the status quo or depart from it. *See: Queen Mary Restaurants Corp. v. NLRB,* 560 F.2d 403 (9th Cir. 1977). The employer's dilemma, then, persists, save when the status quo—the state of existing conditions of employment with respect to wage increases—is clearly apparent and it can with assurance be said that grant or denial of a wage increase would constitute a change from those conditions. In a case where status quo is not clearly apparent, and accordingly the employer's dilemma persists, no inference of antiunion motive can be said to flow from an after-the-fact determination of what the status quo in fact was. There is no rational basis for such an inference unless the status quo is clearly apparent and it can be reasoned that the employer wilfully chose to depart from it.

In deciding that failure to grant a wage increase constituted an unfair labor practice, the Administrative Law Judge ruled that the dispositive question was whether the history of wage increases was such as to "generate 'reasonable expectations' [on the part of the employees] that plant-wide wage increments calculated to match

Safe-T Pacific's rate changes would continue." He found that the employees reasonably expected an increase. He further ruled that the company decision to grant or withhold an increase should have been made just as it would have been made in the absence of the union. Apparently on this basis he refused to consider McCandless's testimony as to advice of counsel. These rulings were adopted by the Board.

■ We cannot accept these rulings. The reasonable expectation of the employees respecting wages cannot be said to have affected their freedom of choice unless their failure to get what they expected was read by them as a warning from the employer as to what the outcome of the election should be. The Administrative Law Judge may have inferred that this was how it was read by them. But in our judgment the focus of inquiry must be upon what the motive of the employer in truth was and not upon what the employees might reasonably (although perhaps mistakenly) have assumed the motive to be. Only when we focus on the employer does the question become the crucial one of his antiunion intent.

■ Further, to hold that in judging employer motive one must hypothesize a case where no union is watchfully present is to ask the employer to behave in an extraordinarily disinterested fashion and to ignore a company problem that management simply cannot be expected to ignore. The question quite simply is whether the employer in good faith sought to comply with the requirements of law. If he did, then failure to grant a wage increase could not constitute an effort to affect the outcome of the election.

■ The Second Circuit has held that in cases such as this there should be a Board finding supported by substantial evidence that the actions of the employer were not taken in a good faith effort to comply with the law. In *NLRB v. Dorn's Trans. Co.*, 405 F.2d 706 (2d Cir. 1969), the trial examiner had found no violation of § 8(a)(1) for failure to give a wage increase, although the

employee had been told that she would not receive an increase until the "union problem" was settled. The examiner found that the increase had been denied after consultation with counsel because it was believed that the increase might constitute an unfair labor practice. The Board disagreed with the examiner's conclusions and found that failure to grant the increase constituted an unfair labor practice. The court found no substantial evidence to support the Board's finding of a violation. It held that where the employer had not given "any * * * indication that the withholding was other than a good faith effort to conform to the requirements of the law" there was no illegal motive and no violation. 405 F.2d at 715.

In *J. J. Newberry Co. v. NLRB*, 442 F.2d 897 (2d Cir. 1971), the court again rejected the Board's finding that failure to grant a wage increase constituted an unfair labor practice. It held:

"An employer's dilemma is particularly obvious in a situation where, as here, wage reviews are fairly regular but the wage increases are subjective and discretionary. In such a case, under *Dorn's*, we should not enforce the Board's order absent a finding, supported by substantial evidence, that the company was illegally motivated and did not act in a 'good faith effort to conform to the requirements of the law'."

442 F.2d at 900.

We agree with those holdings.

■ Here, in our judgment, the status quo was not so clearly apparent as to dissipate the employer's dilemma and accordingly the circumstances were not such as to give rise to an inference of antiunion motive. On this record, absent such an inference, there is not substantial evidence to support a finding that the company did not act in a good faith effort to conform to the requirements of law.

We conclude that the Board's order in this respect is not entitled to enforcement.

### 3. Coercing of Employees

■ The record as a whole does provide support for the Board's holding that the company violated § 8(a)(1) of the Act by interrogating employees about their union sympathies and anticipated votes in the election, and by promising benefits or threatening job loss, depending on the outcome. There was ample testimony to the effect that such conduct had occurred.

The company's principal contention with respect to these alleged violations is that they were not alleged in the complaint, and that motions of the General Counsel to amend the complaint to include them were denied by the Administrative Law Judge. On review of the Administrative Law Judge's holding, the Board overruled the judge's denial of motion to amend and itself amended the written charges to include the unlawful labor practices here involved. The company contends it was denied due process by such amendment. We cannot agree.

■ Where an issue is fairly tried, even though it has not been specifically pleaded, the Board "could render a decision based upon the issues actually tried without ordering amendment or it could order amendment to conform to proof." *Frito Co. v. NLRB*, 330 F.2d 458, 465 (9th Cir. 1964). Thus, although a specific charge is not made in the original complaint, "the Board is not precluded from finding an unfair labor practice if the parties have fully litigated the issue." *NLRB v. Klaue*, 523 F.2d 410, 415 (9th Cir. 1975). *Accord, REA Trucking Co. v. NLRB*, 439 F.2d 1065, 1066 (9th Cir. 1971); *Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1361 (4th Cir. 1969); *American Boiler Manufacturers Assoc. v. NLRB*, 366 F.2d 815, 821 (8th Cir. 1966); *Associated Home Builders of Greater East Bay Inc. v. NLRB*, 352 F.2d 745, 753–55 (9th Cir. 1965).

■ Here there was such full litigation. Evidence as to these unlawful practices was received by the Administrative Law Judge as bearing on the question of anti-union animus of the company, a question that was felt to be relevant to the violations alleged in the complaint. As to this evidence, the Board stated in its decision and order:

"[T]he factual issues concerning the additional 8(a)(1) violations are the same as those involved in proving union animus in connection with the alleged violations of § 8(a)(3) and * * * the Administrative Law Judge's findings with respect to them established 8(a)(1) violations * *."

And further:

"The evidence was exposed to complete cross-examination and opportunity for rebuttal. It does not appear that either the cross-examination or rebuttal testimony would have been any different if the evidence of interrogation and threats had been directed to proof of 8(a)(1) violations as well as union animus. The factual issues with respect to the 8(a)(1) violations were, therefore, fully litigated. Accordingly there is no due process obstacle to permitting the amendment."

We agree.

We conclude that the Board did not act improperly or in violation of the due process rights of the company in amending the charges and taking cognizance of the violations established by the record.

In so far as the order of the Board holds that the Act was violated by the discharge of employees, or by the denial of a wage increase, the petition of Free-Flow is granted and the order of the Board is denied enforcement. In so far as the order holds that the Act was violated by the company in interrogating employees about their union sympathies and anticipated election votes, or by promising benefits or threatening job loss depending on the outcome of the election, the cross-petition of the Board is granted and the order is enforced.

GOODWIN, Circuit Judge, concurring and dissenting.

I concur in the majority's disposition of all the issues except that dealing with the denial of the 1973 wage increase. Here, I would grant enforcement. The hearing officer had an ample evidentiary basis for the

finding that the denial of the wage increase was motivated in part by a management expectation that the union would get the blame.

I am not persuaded by the "advice of counsel" defense. This is not a case of an employer who was faced with a true dilemma. The hearing officer had the right to believe the evidence that the plant manager had told at least one employee, after two years of successive matching pay increases, that, by joining the union, the employees had "blown it" for the next increase.